PERRY RUSSELL TUNNELL, PETITIONER v. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 348–76.    Filed April 14, 1980.

*Henry Schwartz II*, for the petitioner.
*Richard D. Ames*, for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in and additions to the Federal income tax of petitioner as follows:

| Taxable year | Deficiencies in tax | Additions to tax sec. 6653(b), I.R.C. 1954[1] |
|---|---|---|
| 1965 | $2,633.06 | $1,316.53 |
| 1966 | 17,628.74 | 8,814.37 |
| 1967 | 22,731.53 | 11,365.76 |

The parties have made several concessions which will affect the final computation of the deficiencies.[2] Petitioner also concedes that he is collaterally estopped, because of a previous criminal conviction under section 7201, from denying that a part of any underpayment of taxes for the taxable years 1965, 1966, and 1967, if there be any such underpayment, is due to fraud.[3] Due to concessions, the sole issue for our decision is whether petitioner realized income in excess of that reported on his income tax returns based upon unexplained increases in his net worth.

[1]All section references are to the Internal Revenue Code of 1954 as amended.

[2]The parties agreed that respondent's computation of petitioner's investment credit for taxable years 1965, 1966, and 1967 is correct. Petitioner asserted in his amended petition that he sustained net operating losses in 1968 and 1969 that should be carried back to the taxable years here in issue. At trial, he stipulated that no such net operating losses were incurred in 1968 or 1969.

[3]Such concession results in an indefinite extension of the period of limitations for assessment of additional tax for the taxable years here involved. Sec. 6501(c)(1), I.R.C. 1954.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts with attached exhibits are found as facts and incorporated herein by this reference.

Perry Russell Tunnell, hereinafter petitioner, a calendar year taxpayer, timely filed Federal income tax returns for the taxable years 1965, 1966, and 1967 with the District Director of Internal Revenue at Dallas, Tex. Petitioner, listing a Sandra W. Tunnell as his wife, filed joint Federal income tax returns. Petitioner was not married to Sandra W. Tunnell until some time in 1970. On the date the petition herein was filed, petitioner was a resident of Ben Wheeler, Tex.

After his release from prison in 1958, petitioner lived in Corpus Christi, Tex., until some time in 1963. He filed no Federal income tax returns for taxable years 1959, 1960, and 1961. He reported less than $600 of taxable income in each of the taxable years 1962, 1963, and 1964.

In 1963, petitioner moved to Galveston, Tex. On February 19, 1964, petitioner, Roy Brock, and Jean E. Hosey purchased the Sea Courts Motel in Galveston for a total consideration of $18,700.42. They paid the sellers $3,500 in cash and assumed a promissory note payable to Bankers Savings & Loan Association of Galveston, Tex., the outstanding balance of which was, at the time of the sale, $15,200.42. Petitioner provided all of the $3,500 cash payment.

Petitioner was to receive all of the profits from the operation of the motel until he was reimbursed for his cash investment, at which time the three purchasers were to become equal partners in the venture. Brock was to manage the motel. Hosey, a practicing attorney at that time, functioned as the legal adviser to the investors.

On August 11, 1964, petitioner, Brock, and Hosey sold the Sea Courts Motel to Mr. and Mrs. O. Glenn Williamson, who assumed the existing note, which had a remaining balance of $14,869.92, and who, in addition, paid a cash consideration of $5,630.08. Petitioner received the entire $5,630.08, less $100 paid to Hosey for the legal work involved in the sale.

If petitioner owned any other assets in the Galveston area, his disposition of them did not give rise to any notes receivable that remained unpaid on December 31, 1964. The records of the County Clerk of Galveston County, Tex., and the records of the

secretary of state of the State of Texas do not contain any documents regarding the transfer by petitioner of any interest in real or personal property pertaining to two taverns in Galveston, Tex.

Petitioner has a nephew, Perry D. McAlister, who was named after petitioner. Perry D. McAlister was not indebted to petitioner on either December 31, 1964, or December 31, 1965.

In late 1963, petitioner moved to Dallas, Tex., where he acquired an interest in a used-car lot known as Elm Street Motor Co. A George Brewer also owned an interest, and G. M. Lewis was the third partner in the used-car business. Lewis had no investment in the business, but he was paid a weekly salary to run the car lot. In the fall of 1964, Elm Street Motor Co. ceased doing business. The termination and winding-up of the used-car business did not give rise to any notes receivable in petitioner's favor that remained unpaid on December 31, 1964.

In late 1964, petitioner entered into negotiations with Mr. William G. Morton (Morton) for the purchase of the Pines Motel, which was located in Kilgore, Tex. They agreed upon a sales price of $45,250. Morton requested a downpayment of $4,500, whereupon petitioner said that he did not have that much money. They agreed that petitioner would pay $1,000 down, with the remainder of the purchase price to be financed by Morton. On December 4, 1964, petitioner and Morton entered into a contract of sale containing the agreed-upon terms. Petitioner, pleading lack of funds, persuaded Morton to allow him to delay payment of the downpayment until January 21, 1965. Petitioner borrowed the $1,000 for the downpayment from the Kilgore National Bank. Mr. R. L. Whitehead cosigned the required promissory note, and the loan evidenced thereby was consummated on January 5, 1965. The $1,000 downpayment was delivered to Morton in January 1965.

On April 22, 1965, petitioner filed a financial statement with the Houston National Bank. The only assets listed were: (1) $1,000 in cash on hand, (2) $10,000 of life insurance, and (3) the Pines Motel.

On July 16, 1965, petitioner, by use of a draft drawn on his bank account, paid $220 to Mr. W. D. Gates (Gates). A week later, a similar draft in the amount of $1,020 accomplished a similar transfer of funds to Gates. These payments by petitioner

to Gates extinguished petitioner's liability to Gates on loans arising during 1965.

At various times prior to 1972, several agents of the Internal Revenue Service examined petitioner's Federal income tax returns for several taxable years. Mr. John M. Shelton, a revenue agent, examined petitioner's tax returns for the taxable years 1962, 1963, and 1964. Mr. Shelton was aware of the sale of the Sea Courts Motel, and he verified that petitioner participated in the sale of that property. Mr. Shelton was apprised of petitioner's involvement with the Elm Street Motor Co. to the extent that he knew that petitioner owned an interest in the venture. Petitioner provided Mr. Shelton with no business records regarding the Elm Street Motor Co. Petitioner told Mr. Shelton during the examination that he had no other sources of income during those years, and that he had to live off borrowed funds. Mr. Shelton determined that no change was necessary to the tax reported for those years, and the returns were accepted as filed. A letter to that effect was sent to petitioner on December 2, 1965.

Mr. Barnie Bunt, a revenue agent, was assigned to audit petitioner's tax returns for the taxable years 1965, 1966, and 1967. The audit commenced on November 21, 1968, with an interview with petitioner at the Pines Motel in Kilgore, Tex. At this interview, petitioner provided Mr. Bunt with his business records which did not reconcile with petitioner's income tax returns for the years under audit. Petitioner stated that his only sources of income during this time were the Pines Motel and the Mecca Lodge. The records provided did not disclose, nor did petitioner mention, any promissory notes receivable that originated from petitioner's activities in Corpus Christi, Galveston, or Dallas. Petitioner did not mention, nor was Mr. Bunt aware of, petitioner's involvement with Elm Street Motor Co. Petitioner stated that at no time during 1965, 1966, or 1967 did he have on hand more than $1,000 cash.

At this point, Mr. Bunt referred this case to the Intelligence Division of the Internal Revenue Service. Mr. Gann, a special agent for the Internal Revenue Service, was assigned to investigate the possibility that petitioner might have committed criminal tax fraud under section 7201. Mr. Gann interviewed petitioner several times during his investigation. After confirming that petitioner's business records did not reflect all of his

taxable income, Mr. Gann attempted to reconstruct petitioner's income using the net worth method.

Mr. Gann exhaustively examined petitioner's business and bank records. He nowhere discovered any evidence of the existence of any notes receivable owned by petitioner which originated from his participation in the Elm Street Motor Co. venture. Nor did he discover any evidence of notes receivable arising from the sale of any assets owned by petitioner while he lived in Corpus Christi or Galveston. No notes receivable from Perry D. McAlister were found. During the investigation, petitioner did not mention the possible existence, at any time, of notes receivable originating from his business ventures in Corpus Christi, Galveston, or Dallas. Nor did he suggest that he had ever lent money to Perry D. McAlister.

During his investigation, Mr. Gann did discover evidence of the two drafts payable to Mr. W. D. Gates described above. Petitioner explained the drafts by telling Mr. Gann that he borrowed money in 1964 to buy a car, and that Mr. Gates cosigned the car note. After Mr. Gates was forced to make several of the payments, petitioner repaid him by use of the drafts. In response to Mr. Gann's request for verification, Mr. Gates confirmed, in a letter to Mr. Gann dated May 4, 1970, that the payments were in the nature of loan repayments.

Contradicting what he told Mr. Bunt, petitioner told Mr. Gann that the most cash he had on hand at any one time during 1965, 1966, and 1967 was $300.

Mr. Gann's investigation led him to recommend criminal prosecution of petitioner under section 7201. On February 28, 1972, a grand jury indicted petitioner under that section for willfully and knowingly attempting to evade and defeat part of the income tax due and owing by him for the taxable years 1965, 1966, and 1967. Petitioner pleaded not guilty to the charge, but was convicted. Judgment was entered on the conviction on November 29, 1972, and petitioner was sentenced to 4 years' imprisonment. The conviction was affirmed by the United States Court of Appeals for the Fifth Circuit on July 18, 1973.

At the criminal trial, the Government used the net worth method to establish petitioner's correct taxable income for the years involved. The use of the net worth method for establishing a taxpayer's taxable income requires that the taxpayer's net worth at the beginning and end of each taxable year at issue be

established. The annual increase in net worth, adjusted for allowable depreciation, plus nondeductible expenses (such as living expenses and personal expenditures) constitutes the taxpayer's net income for the taxable year, to the extent that the increase does not consist of nontaxable sources of property or funds. Petitioner sought in the criminal trial to prove that the Government's calculation of his net worth as of December 31, 1964 (the beginning of the net worth period), was understated.

With the conviction in the criminal trial, Mr. Gann's involvement with the investigation of petitioner's tax liability ceased.

After the criminal trial, Mr. Bunt continued his investigation of petitioner's civil tax liability for the taxable years 1965, 1966, and 1967. He participated in the preparation of the statutory notice of deficiency, which was mailed to petitioner on October 16, 1975.

On the four dates relevant to this controversy, petitioner's assets and liabilities were as follows:

| Assets | 12/31/64 | 12/31/65 | 12/31/66 | 12/31/67 |
|---|---|---|---|---|
| Cash on hand | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 |
| Cash in banks | 21.59 | 383.24 | 244.41 | (22.84) |
| Real estate and improvements | 48,500.00 | 48,964.47 | 53,839.85 | 70,679.85 |
| Mobile homes—trailers | 3,855.30 | 18,225.30 | 34,500.30 | 34,500.30 |
| Furniture and fixtures | 0 | 7,802.32 | 15,266.07 | 18,118.53 |
| Automobiles and trucks | 5,105.00 | 13,310.00 | 13,804.42 | 16,426.92 |
| Livestock | 0 | 0 | 1,080.00 | 8,766.00 |
| Farm equipment and improvements | 0 | 50.00 | 15,564.33 | 32,405.69 |
| Meter deposits | 275.00 | 600.00 | 600.00 | 600.00 |
| Oil and gas leases | 660.00 | 660.00 | 660.00 | 660.00 |
| Prepaid insurance | 0 | 784.39 | 1,566.22 | 1,149.00 |
| Deferred interest | 96.50 | 3,673.10 | 6,871.74 | 5,287.75 |
| Notes receivable: | 1,231.64 | 1,231.65 | 1,231.66 | 1,231.67 |
| Jack Peters | 0 | 0 | 2,150.00 | 8,062.66 |
| Sale of Galveston assets | 0 | 0 | 0 | 0 |
| Elm Street Motors | 0 | 0 | 0 | 0 |
| Perry D. McAlister | 0 | 0 | 0 | 0 |
| Liabilities | | | | |
| Mortgages and notes payable | 56,305.27 | 77,721.24 | 81,753.82 | 69,763.98 |
| Additional notes payable | 0 | 0 | 0 | 0 |
| Reserve for depreciation | 2,374.09 | 8,126.52 | 14,590.20 | 27,775.03 |

Petitioner's net worth on the four dates relevant to this controversy was:

| Date | Net worth |
|------|-----------|
| Dec. 31, 1964 ............... | $2,065.67 |
| Dec. 31, 1965 ............... | 10,837.71 |
| Dec. 31, 1966 ............... | 52,034.98 |
| Dec. 31, 1967 ............... | 101,326.52 |

Petitioner's personal living expenses, for the taxable years here at issue, were:

| Year | Personal living expenses |
|------|--------------------------|
| 1965 ........................... | $4,901.30 |
| 1966 ........................... | 3,564.19 |
| 1967 ........................... | 4,784.60 |

Using the net worth method, the Commissioner determined the deficiencies and penalties listed at the beginning of these findings of fact. Petitioner contends that respondent's calculations of petitioner's cash on hand, accounts receivable, and accounts payable are erroneous.

## OPINION

Petitioner's Federal income tax returns for the taxable years 1965, 1966, and 1967 were audited by Revenue Agent Bunt and by Special Agent Gann. The latter's investigation resulted in a criminal prosecution of petitioner under section 7201 for tax fraud for those taxable years, which prosecution resulted in petitioner's indictment, trial, and conviction on those charges. Because petitioner's business records did not reflect all of his taxable income, Mr. Gann reconstructed petitioner's income using the net worth method. Similarly, the revenue agent, Mr. Bunt, used this method to determine petitioner's correct taxable income for purposes of preparing the Commissioner's statutory notice of deficiency for these 3 taxable years. Where, as here, a taxpayer's books and records are inadequate for the purpose of determining his taxable income, the Commissioner is justified in using the net worth method to arrive at his determination of the taxpayer's correct taxable income for the years in question. *Lipsitz v. Commissioner*, 21 T.C. 917 (1954), affd. 220 F.2d 871 (4th Cir. 1955), cert. denied 350 U.S. 845 (1955). Any deficiencies determined by the use of such method are prima facie correct

unless shown to be erroneous. *Sunbrock v. Commissioner*, 48 T.C. 55 (1967).

Because this controversy has resolved itself into a dispute over the amount of petitioner's net worth on December 31, of 1964, 1965, 1966, and 1967, a determination of each disputed item affecting those amounts must be made. The parties have agreed on the following items·

| Assets | 12/31/64 | 12/31/65 | 12/31/66 | 12/31/67 |
|---|---|---|---|---|
| Cash on hand | d[1] | d | d | d |
| Cash in banks | $21.59 | $383.24 | $244.41 | ($22.84) |
| Real estate and improvements | 48,500.00 | 48,964.47 | 53,839.85 | 70,679.85 |
| Mobile homes—trailers | 3,855.30 | 18,225.30 | 34,500.30 | 34,500.30 |
| Furniture and fixtures | 0 | 7,802.32 | 15,266.07 | 18,118.53 |
| Automobiles and trucks | 5,105.00 | 13,310.00 | 13,804.42 | 16,426.92 |
| Livestock | 0 | 0 | 1,080.00 | 8,766.00 |
| Farm equipment and improvements | 0 | · 50.00 | 15,564.33 | 32,405.69 |
| Meter deposits | 275.00 | 600.00 | 600.00 | 600.00 |
| Oil and gas leases | 660.00 | 660.00 | 660.00 | 660.00 |
| Prepaid insurance | 0 | 784.39 | 1,566.22 | ·1,149.00 |
| Deferred interest | 96.50 | 3,673.10 | 6,871.74 | 5,287.75 |
| Notes receivable | 1,231.64 | 1,231.65 | 1,231.66 | 1,231.67 |
| Jack Peters | 0 | 0 | 2,150.00 | 8,062.66 |
| Sale of Galveston assets | d | d | 0 | 0 |
| Elm Street Motors | d | 0 | 0 | 0 |
| Perry D. McAlister | d | d | 0 | 0 |
| *Liabilities* | | | | |
| Mortgages and notes payable | 56,305.27 | 77,721.24 | 81.753.82 | 68,763.98 |
| Additional notes payable | d | 0 | 0 | 0 |
| Reserve for depreciation | 2,374.09 | 8,126.52 | 14,590.20 | 27,775.03 |

_____
[1]d—The parties dispute the amount of this item.

The parties are in dispute over three classes of items: petitioner's cash on hand, his notes receivable, and his additional notes payable. Respondent's determination reflected in his statutory notice of deficiency and petitioner's contentions with regard to these items are set out below:

| Cash on hand | 12/31/64 | 12/31/65 | 12/31/66 | 12/31/67 |
|---|---|---|---|---|
| Respondent's determination | $1,000 | $1,000 | $1,000 | $1,000 |
| Petitioner's contention | 17,500 | 300 | 300 | 300 |
| Notes receivable | | | | |
| Sale of Galveston assets: | | | | |
| Respondent's determination | 0 | 0 | | |
| Petitioner's contention | 15,000 | 7,500 | | |

| | 12/31/64 | 12/31/65 | 12/31/66 | 12/31/67 |
|---|---|---|---|---|
| Elm Street Motors: | | | | |
| Respondent's determination... | 0 | | | |
| Petitioner's contention......... | 20,000 | | | |
| Perry D. McAlister: | | | | |
| Respondent's determination... | 0 | 0 | | |
| Petitioner's contention......... | 4,225 | 2,112.50 | | |
| *Notes payable* | | | | |
| W. D. Gates: | | | | |
| Respondent's determination... | 1,240 | | | |
| Petitioner's contention......... | 0 | | | |

At trial, petitioner attempted to support his contentions regarding the above-listed disputed figures by testifying to and adducing testimony about several factual scenarios that, if true, would support his calculations. We will review this testimony and comment on its credibility.

Petitioner cryptically testified to having owned some interests in three nightclubs in Corpus Christi during the years 1958–62. He supposedly sold his interests to a woman named Christine Phillips and to a "Jones girl" in 1962 for some cash and promissory notes of unknown amounts. Petitioner does not contend that such notes were outstanding on December 31, 1964, but seems to intimate that payments on such notes provided some cash during the time prior to the taxable years here involved. Absolutely no documentation or corroboration of. this testimony was produced at trial. Lewis, petitioner's associate in the Dallas used-car venture, claims to have accompanied petitioner on two treks to Corpus Christi in 1964 to pick up "a pretty good bunch of money" from unidentified sources. Based upon our observation of the witnesses, we find both witnesses' testimony concerning petitioner's purported Corpus Christi business ventures to be incredible. We are disinclined to belived that any promissory notes ever existed.

Petitioner's next line of testimony concerned his business activities in Galveston, Tex. Petitioner's dealings with regard to the Sea Courts Motel are well documented, and we have found as a fact that petitioner received $5,530.08 upon the sale of that property, which sale occurred on August 11, 1964. Petitioner points to that transaction as partial proof of his claimed December 31, 1964, cash hoard of $17,500. In light of the passage of time between the sale and the end of the year, as well as other factors later to be discussed, we do not perceive such evidence to be compelling or determinative.

Petitioner also points to his dealings in Galveston as the source

of a total of $15,000 in notes receivable that he would have this Court find was owing to him on December 31, 1964. Petitioner claims to have leased two taverns in the Galveston area in 1962 and to have invested about $15,000 in furniture, fixtures, and stock for the taverns. Then, in 1964, he supposedly sold the lease rights and improvements to a man named Lacey for two promissory notes in the face amounts of $10,000 and $5,000 and an unknown amount of cash. No documentary evidence of such notes was produced at trial. Hosey, petitioner's attorney in Galveston and coventurer in the Sea Courts Motel venture, testified to having prepared at petitioner's request two promissory notes in the face amounts of $10,000 and $5,000 that were to be used in the above-described sale to Lacey. However, though Hosey normally prepared chattel mortgages to accompany such notes, he testified that he had not done so in this case. Furthermore, the records of the County Clerk of Galveston, Tex., and the records of the secretary of state of the State of Texas do not contain any documents confirming the transfer by petitioner of any interest in real or personal property pertaining to two taverns in Galveston. Petitioner's income tax returns for 1962 through 1965 did not reflect either the operation of any such taverns or any sale transaction concerning such taverns. Petitioner introduced a deposition of Brock, his coventurer in the Sea Courts Motel investment, in an attempt to prove the existence of the promissory notes here in question, but Brock's testimony in the deposition is hopelessly confused and useless to this Court. Taking the evidence, or lack thereof, as a whole, we find that petitioner has failed to carry his burden of proving the existence of the two notes receivable in the total amount of $15,000, which he claimed were outstanding on December 31, 1964, or that a balance of $7,500 was outstanding on December 31, 1965. Respondent's determination that no such notes receivable existed has a presumption of correctness. *Sunbrock v. Commissioner*, 48 T.C. 55 (1967). Such vague, self-serving, uncorroborated testimony as petitioner has here produced does not, in this case, overcome that presumption.

In a further attempt to augment his notes receivable balance as of December 31, 1964, petitioner introduced evidence relating to his involvement with Elm Street Motor Co., a Dallas, Tex., used-car operation in which he was involved during 1963 and 1964. It is undisputed that petitioner, Brewer, and Lewis, under

some kind of joint venture arrangement, operated Elm Street Motor Co. until the fall of 1964, at which time the used-car venture ceased doing business. However, the facts surrounding the termination of the business are not agreed upon by the parties to this litigation. It is petitioner's contention that upon the termination of the business, he received $4,000 to $5,000 in cash, a cashier's check for $1,600, several cars remaining on the lot, and title to notes with a total face amount of $25,000 to $30,000. These notes had been executed in favor of Elm Street Motor Co. by individuals who purchased cars from that used-car lot. Petitioner supposedly collected approximately $7,000 on the notes by December 31, 1964, and he contends that the remaining notes receivable on that date totaled $20,000. He also contends that he disposed of the remaining cars by the end of 1964, realizing approximately $3,000 on their sale. According to petitioner, he disposed of the remaining notes receivable during 1965, realizing approximately 50 percent of their face value. The testimony of Lewis generally corroborates this account of the winding-up of the used-car business.

Respondent, on the other hand, denies that petitioner received anything upon the termination of the used-car business. He points out that petitioner's 1964 income tax return contains no reference to the operation of Elm Street Motor Co.; that petitioner never mentioned the used-car operation to Revenue Agent Bunt or Special Agent Gann; that there is absolutely no documentary evidence supporting petitioner's scenario; that petitioner's books and records contain no evidence of petitioner's ownership or collection of any notes receivable pertaining to the used-car operation; and that petitioner did not indicate the possession or collection of any notes receivable on the financial statement he filed with the Houston National Bank in April of 1965. We do not believe petitioner or Mr. Lewis. Their account of the termination of the used-car business seems to have first surfaced at the time of petitioner's criminal tax-fraud trial. The undocumented, unsupported testimony of petitioner and his friend, Mr. Lewis, does not ring true to this Court.

Petitioner's final attempt to prove the existence of a note receivable on December 31, 1964, consisted of testimony by petitioner and his nephew, Perry D. McAlister, alleging that Mr. McAlister borrowed a total of $4,225 from petitioner during 1963 and 1964. They testified that the loans were repaid, of course,

sometime in 1965 or 1966. Again no documentary evidence was available to corroborate this story. And, again, petitioner's actions and statements prior to his criminal trial, where this "transaction" first surfaced, were totally inconsistent with the existence of such loans. Based on the facts before us and our observance of the testimony of petitioner and Mr. McAlister, we are disinclined to believe that petitioner owned a note receivable from Perry D. McAlister on December 31 of either 1964 or 1965.

Many of petitioner's claims concerning the amount of cash he had on hand on December 31, 1964, 1965, 1966, and 1967 were linked to his claims concerning his business ventures in Corpus Christi, Galveston, and Dallas. Consistent with our findings with regard to the notes receivable that allegedly arose from those ventures, we here find that those sources provided no great hoards of cash which increased petitioner's cash on hand as of December 31, 1964. Petitioner claimed, in a financial statement prepared on April 22, 1965, to have only $1,000 cash on hand. He told Revenue Agent Bunt, during an audit interview, that he had never had more than $1,000 cash on hand during 1965, 1966, or 1967. On January 6, 1965, he was forced to borrow the $1,000 downpayment required in a contract for the purchase of the Pines Motel in Kilgore, Tex. We are convinced that respondent's determination that petitioner's cash-on-hand balance on December 31 of 1964, 1965, 1966, and 1967 was $1,000 is correct. Petitioner has dismally failed to rebut the presumption in favor of respondent's determination. *Welch v. Helvering,* 290 U.S. 111 (1933). We find that on December 31 of 1964, 1965, 1966, and 1967, petitioner had $1,000 cash on hand.

In July of 1965, on two separate occasions 1 week apart, petitioner paid, with bank drafts, a total of $1,240 to Mr. W. D. Gates of Port Aransas, Tex. Respondent contends that these payments were made to extinguish a debt owed to Gates that was outstanding on December 31, 1964. Petitioner denies the existence of any loan, but argues that if the payments were loan repayments, the loan arose in 1965. The evidence presented on this issue is very vague, but it appears, according to petitioner's representations to Special Agent Gann, that Gates cosigned a promissory note to enable petitioner to purchase a car in 1964. Petitioner fell behind on the note payments, and Gates was forced to make some payments. Then, as the story goes, petitioner repaid Gates during 1965. We are concerned only with

the date the debt to Gates arose, and it is as likely to have arisen in 1965 as in 1964. Respondent presented no evidence that would dispute petitioner's contention that the indebtedness to Gates, if any, arose in 1965. Viewing the record as a whole, we conclude that on December 31, 1964, petitioner did not owe any amount of money to Gates.

Thus concludes our examination and determinations concerning the disputed items of petitioner's net worth on the four dates that are relevant to this controversy. Obviously, petitioner has been rebuffed on most of his contentions because of his failure to overcome the presumption of correctness that clothes the Commissioner's determination. Normally, such failure would be determinative of the issues before us. However, petitioner has raised an argument on brief that, if successful, would require us to reconsider the weight of the burden of proof that petitioner must bear in order to overcome respondent's determination.

Petitioner seeks to invoke the "lead-check rule" which was first announced in *Holland v. United States*, 348 U.S. 121 (1954). In that case, which involved a prosecution for criminal tax fraud under the predecessor to our current section 7201, the Court had this to say about the Government's evidentiary burden when it uses the net worth method to prove criminal tax fraud:

When the Government rests its case solely on the approximations and circumstantial inferences of a net worth computation, the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt. Such refutation might fail when the Government does not track down relevant leads furnished by the taxpayer—leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence. When the Government fails to show an investigation into the validity of such leads, the trial judge may consider them as true and the Government's case insufficient to go to the jury. * * * [*Holland v. United States, supra* at 135, 136.]

Noting that this "rule" has been extended to civil tax-fraud cases (*Fairchild v. United States*, 240 F.2d 944 (5th Cir. 1957)), petitioner argues that the rationale of these cases applies in the instant case in such a way as to require us to resolve any factual ambiguities or failures of proof in petitioner's favor. However, petitioner misapprehends both the applicability of the "lead-check rule" in this case and this Court's willingness to exercise the discretion granted by the rule in petitioner's favor.

Petitioner's understanding of the applicability of the "lead-check rule" seems to be this: if respondent uses the net worth

method to establish income tax deficiencies against petitioner, and he also determines an addition to tax for civil tax fraud under section 6653(b), then the "lead-check rule" applies, even where, as here, the fraud issue is conceded, and the only controversy is over the amount of the deficiency. This conclusion stems from the simplistic syllogism that (1) *Holland v. United States, supra,* announced the rule in criminal tax-fraud cases; (2) *Fairchild v. United States, supra,* said the rule is applicable in civil tax-fraud cases; (3) this is a civil tax-fraud case; *therefore,* (4) the rule is applicable here. We disagree.

In the *Holland* case, wherein the "lead-check rule" had its genesis, the Court was faced, in a criminal tax-fraud case, with a situation where the Government had the burden of proving the taxpayer's guilt. Again, in *Fairchild v. United States, supra,* a civil tax-fraud case, the Government had the burden of proving that part of the underpayment of tax was due to fraud.

The "lead-check rule" originated in *Holland v. United States, supra,* a criminal fraud case in which the Government had to prove fraud beyond a reasonable doubt. It was applied later in *Fairchild v. United States, supra,* a civil fraud case, where the Commissioner had the burden of proving an underpayment of tax and a fraudulent intent to evade. In the instant case, the Commissioner has no burden of proof. Petitioner has conceded that he is collaterally estopped to deny fraud because of his criminal conviction. The burden of proof in the instant case is on petitioner to show the absence of a deficiency in tax. *Welch v. Helvering, supra;* Rule 142(a), Tax Court Rules of Practice and Procedure. The "lead-check rule" is not applicable here.

Moreover, even if the "lead-check rule" were applicable here, we are convinced that it would not aid petitioner. Initially, it must be noted that petitioner's evidence concerning the "leads" he provided was sorely lacking in quantity and quality. In his attempt to shore up his calculations with regard to his cash and accounts receivable balances on December 31, 1964, petitioner relied exclusively on his testimony of his Corpus Christi, Galveston, and Dallas business dealings. His "leads" with regard to those purported transactions were not provided during the initial audit interviews with Revenue Agent Bunt, but rather, according to petitioner's testimony, surfaced initially at his criminal trial. We must comment, at this juncture, that we have no direct evidence as to what was said at the criminal trial.

Petitioner, who leaned so heavily on the supposed content of the testimony at that trial, did not submit into evidence transcripts of any criminal trial testimony that dealt with the issues of his cash and accounts receivable balances. Beyond this failure of evidence, we are also dubious of the value of "leads" which are forthcoming only when the taxpayer is seeking at trial to avoid a criminal conviction. Moreover, we are not convinced that the Government failed to track down all the relevant leads furnished by petitioner.

More importantly, assuming arguendo (1) that the "lead-check rule" were here applicable, (2) that petitioner's evidence concerning the "leads" he furnished to respondent's agents was substantial and convincing, and (3) that respondent failed to adequately investigate such "leads," we must here emphatically state that this Court is not, as petitioner seems to believe, *required* to accept the substance of the "leads" as true. Even in the *Holland* case, the effect a trial judge is to give to such evidence is purely discretionary, as evidenced by the use of the permissive "may." *Holland v. United States, supra* at 316. Furthermore, the language of the Court seems to indicate that the facts proposed by the taxpayer are to be considered to be true only for purposes of determining whether the Government can survive a motion for directed verdict. We need not decide the exact import of the Court's language inasmuch as we have found that the principles announced in *Holland v. United States, supra,* are inapplicable in the case before us.

In summary, we have determined above the correct amounts among those items of petitioner's net worth statements that were disputed. Petitioner was largely unsuccessful in his attempts to disprove respondent's determinations of those amounts because of his failure to overcome the presumption of correctness of respondent's determination. Petitioner's attempt to weaken or eliminate that presumption by trying to prove that respondent did not pursue "leads" provided to him by petitioner is futile because the "lead-check rule" is not applicable in a case, such as this, where respondent has no burden of proof (the fraud issue having been eliminated by the agreed-upon applicability of the doctrine of collateral estoppel).

Aggregating our findings with regard to the disputed items of petitioner's net worth statements with the undisputed items of those statements, we arrive at the following itemizations of

petitioner's net worth on the four dates relevant to this controversy.

| Assets | 12/31/64 | 12/31/65 | 12/31/66 | 12/31/67 |
|---|---|---|---|---|
| Cash on hand | $1,000.00 | $1,000.00 | $1,000.00 | $1,000.00 |
| Cash in banks | 21.59 | 383.24 | 244.41 | (22.84) |
| Real estate and improvements | 48,500.00 | 48,964.47 | 53,839.85 | 70,679.85 |
| Mobile homes—trailers | 3,855.30 | 18,225.30 | 34,500.30 | 34,500.30 |
| Automobiles and trucks | 5,105.00 | 13,310.00 | 13,804.42 | 16,426.92 |
| Furniture and fixtures | 0 | 7,802.32 | 15,266.07 | 18,118.53 |
| Livestock | 0 | 0 | 1,080.00 | 8,766.00 |
| Farm equipment and improvements | 0 | 50.00 | 15,564.33 | 32,405.69 |
| Meter deposits | 275.00 | 600.00 | 600.00 | 600.00 |
| Oil and gas leases | 660.00 | 660.00 | 660.00 | 660.00 |
| Prepaid insurance | 0 | 784.39 | 1,566.22 | 1,149.00 |
| Deferred interest | 96.50 | 3,673.10 | 6,871.74 | 5,287.75 |
| Notes receivable | 1,231.64 | 1,231.65 | 1,231.66 | 1,231.67 |
| Jack Peters | 0 | 0 | 2,150.00 | 8,062.66 |
| Sale of Galveston assets | 0 | 0 | 0 | 0 |
| Elm Street Motors | 0 | 0 | 0 | 0 |
| Perry D. McAlister | 0 | 0 | 0 | 0 |
| Total assets | 60,745.03 | 96,684.47 | 148,379.00 | 198,865.53 |
| | | | | |
| Liabilities | | | | |
| Mortgages and notes payable | 56,305.27 | 77,721.24 | 81,753.82 | 69,763.98 |
| Additional notes payable | 0 | 0 | 0 | 0 |
| Reserve for depreciation | 2,374.09 | 8,126.52 | 14,590.20 | 27,775.03 |
| Total liabilities | 58,679.36 | 85,847.76 | 96,344.02 | 97,539.01 |
| | | | | |
| Net worth | 2,065.67 | 10,836.71 | 52,034.98 | 101,327.52 |

With these findings, the parties shall compute petitioner's correct Federal income tax liabilities for the taxable years 1965, 1966, and 1967. As previously noted, petitioner will also be liable for additions to tax under section 6653(b) for those taxable years.

*Decision will be entered under Rule 155.*