**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Fred T. MACKEY, Defendant-Appellant.
No. 14584.**

United States Court of Appeals
Seventh Circuit.

April 1, 1965.

Rehearing Denied May 13, 1965
(En Banc).

☞139

Robert J. Downing, Edward B. Stroh, Chicago, Ill., Raskin & Downing, William M. Ward, Kevin M. Forde, Chicago, Ill., of counsel, for appellant.

Charles A. McNelis, Joseph M. Howard, Attys., Tax Div., Dept. of Justice, Washington, D. C., Alfred W. Moellering, U. S. Atty., Fort Wayne, Ind., Louis F. Oberdorfer, Asst. Atty. Gen., Richard B. Buhrman, Atty., Dept. of Justice, Washington, D. C., for appellee.

Before HASTINGS, Chief Judge, and KILEY and SWYGERT, Circuit Judges.

HASTINGS, Chief Judge.

Defendant Fred T. Mackey was indicted in March, 1963 in five counts for "willfully and knowingly attempt[ing] to evade and defeat a large part of the income tax due and owing by him and his wife for the calendar year[s] of 1956 [through 1960] by willfully preparing and causing to be prepared  *  *  * false and fraudulent income tax return[s]  *  *  * [i]n violation of Section 7201 Internal Revenue Code; 26 U.S.C. Section 7201."

A jury verdict and judgment entered thereon found defendant guilty on all five counts. Defendant was fined $10,000 and

costs and sentenced to five years in prison on each count, the prison sentences to run concurrently. Defendant paid the fine and costs which totaled $65,000. The district court stayed the judgment pending appeal and defendant appealed.

Government used the net worth method to prove its case. Government's theory at the trial was as follows. The net worth of defendant and his wife at the starting point, December 31, 1955, was $361,461.52 and their net worth at the end of 1960 was $1,519,744.05. These amounts included assets held in the names of the Gibraltar insurance companies (discussed infra) and other nominees for the benefit of defendant. During this five-year period defendant and his wife reported $143,339.24 of taxable income.

Government contended that the Gibraltar Industrial Life Insurance Company (Gibraltar Industrial), Gibraltar Mutual Life Insurance Company (Gibraltar Mutual) and the M.W.E. & S. Investment Company, Inc.,[1] were entirely under defendant's dominion and control. It asserted these companies had three safes into which flowed an average of about $4000 per week in currency during the five prosecution years, in excess of the sums which could be accounted for by the combined gross receipts of the companies, plus the income reported by defendant and his wife, and that defendant helped himself to this excess at will.

Government's theory was that the source of defendant's excessive net worth increases was a policy wheel operation which defendant admitted conducting and that the excess of $4000 per week, supra, was from profits earned by defendant on this operation.

Government, in its brief, states that the main issue at the trial was whether this excess $4000 per week was from the policy wheel operation or from unrecorded and unreported premium income earned by the Gibraltar companies.

On appeal, defendant lists seventeen issues and states:

"The principal errors relied upon are: the court refused to grant defendant ten peremptory challenges as provided in *Rule 24(b), Federal Rules of Criminal Procedure*, and was granted only eight such challenges; numerous errors in the admission of evidence, both oral testimony and documentary; failure to strike an admittedly incorrect and inaccurate net worth summary, Gov. Ex. 800 (consisting of 50 pages) and related exhibits 801, 802 and 803; failure of the government to meet the standards set down for net worth cases and the unconstitutionality of such method as applied to this case; failure to grant many defendant motions to suppress and strike evidence and for mistrial; denial of motion for acquittal made at conclusion of the government's case and after the jury verdict; in certain instruction given and refused and in repeating certain instructions to the jury during its deliberation; prejudicial remarks of the court; and the failure to hold a post-trial hearing upon the allegation that a petit juror was secretary to the foreman of the grand jury."

I

Defendant contends the district court committed reversible error by invoking a rule which limited him to eight peremptory challenges rather than permitting him ten as provided by Rule 24(b), Federal Rules of Criminal Procedure, 18 U.S.C.A.

On the first day of the trial, the district court announced that Government would first have opportunity to exercise peremptory challenges and that upon exercising these challenges no further challenges would be allowed except as to new jurors who might come into the jury

---

1. The initials for this corporation apparently were derived as follows: "M" from defendant's name (Mackey), "W" from the middle name of defendant's son (Wardell), "E" from defendant's wife's first name (Ella) and "S" from defendant's daughter's first name (Sesame).

box as a result of challenges made by defendant. The court said the same rule would apply to defendant. The effect of this rule was to permit each side one opportunity to challenge each prospective juror. Defendant objected to this rule.

Government did not exercise any challenges on its first opportunity. Defendant exercised eight peremptory challenges and tendered the panel back to Government. Government challenged one of the eight new members of the panel, accepted the juror who replaced this member and accepted the jury as then constituted. Defendant expressed the desire to exercise one or two of his remaining two peremptory challenges as to prospective jurors *other than the one who replaced the member challenged by Government*. The court ruled that defendant could only peremptorily challenge the new juror. Defendant objected to this ruling and did not challenge the new juror.

■ The manner in which peremptory challenges are exercised is within the sound discretion of the trial court, see Pointer v. United States, 151 U.S. 396, 410, 14 S.Ct. 410, 38 L.Ed. 208 (1894), and in the absence of violation of settled principles of criminal law, federal statutes or constitutional rights of defendant, such discretion is not abused. See Id. at 407, 408, 14 S.Ct. 410.

Defendant complains he was given only one opportunity to challenge each juror and that while he had the opportunity to exercise all ten of his peremptory challenges, the court's rule denied him the effective use of two challenges.

The Supreme Court approved a rule which gave each party only one opportunity to peremptorily challenge each juror. St. Clair v. United States, 154 U.S. 134, 147–148, 14 S.Ct. 1002, 38 L.Ed. 936 (1894). The Supreme Court also approved a method which could deny a party the effective use of some of his peremptory challenges. In Pointer v. United States, supra, the trial court used a method of peremptory challenge by which all jurors were examined, thirty-seven found

qualified to sit and each party given a list of these thirty-seven jurors. From these lists Government could strike five and defendant twenty names. Defendant argued, in essence, that Government may have struck some of the same names which he struck and that Government should have been required to strike names before the list was tendered to him so that he would not waste his challenges on names struck by Government. The Supreme Court in upholding this method stated:

"It is true that, under the method pursued in this case, it might occur that the defendant would strike from the list the same persons stricken off by the government, but that circumstance does not change the fact that the accused was at liberty to exclude from the jury all, to the number of 20, who, for any reason, or without reason, were objectionable to him. No injury was done if the government united with him in excluding particular persons from the jury. He was not entitled of right to know in advance what jurors would be excluded by the government in the exercise of its right of peremptory challenge. He was only entitled of right to strike the names of 20 from the list of impartial jurymen furnished him by the court." Pointer v. United States, supra 151 U.S. at 412, 14 S.Ct. at 416.

Defendant places primary reliance on Avila v. United States, 9 Cir., 76 F.2d 39 (1935). The majority opinion, which held that defendant was denied the constitutional right of trial by jury because the court denied him a peremptory challenge on the ground he had *waived* this challenge, appears to be based upon the trial court's failure to follow Rule 51 of the District Court for the Southern District of California. To the extent that the majority opinion does not rely on Rule 51, we disagree with it. We agree with the dissent filed in that case, to the effect that the trial court did not abuse its discretion by invoking a rule similar

to the one in the instant case. 76 F.2d 43.

In the instant case, the panel of prospective jurors was examined on *voir dire* by the trial judge in the presence of defendant; defendant understood that he would have but one opportunity to challenge each juror; and defendant challenged eight jurors the first time the panel was tendered to him. He had an opportunity to challenge one juror the second time the panel was tendered but chose not to do so. We conclude defendant has not been denied any statutory or constitutional right and hold the district court did not abuse its discretion in the rule it invoked for the use of peremptory challenges.

We disagree with defendant's contention that a new trial is required because petit juror Dolores Watkins did not state upon *voir dire* examination that she was employed by Leslie Ross Bain, the foreman of the grand jury which returned the instant indictment against defendant. There is no evidence that Watkins concealed this fact. She testified on *voir dire* that she was a secretary for the insurance firm of Guffin, MacLennan & *Bain*.

## II

Defendant urges that the manner in which the net worth method was applied in this case denied him due process of law and was unconstitutional. His reasons are as follows:

"(a) assets allegedly owned by the defendant, his wife, and three separate corporate entities are mixed together in the government's net worth statement; (b) starting point (Dec. 31, 1955) not correct; (c) assets included with no evidence connecting them to defendant or Mrs. Mackey; (d) amounts arbitrarily determined; (e) evidence does not establish ownership of asset by defendant or Mrs. Mackey as of December 31 for each of the years; (f) the net worth statement is based in part on a 13th juror; (g) failure to investigate; (h) lack of proof of current taxable income from a likely source for each year; and (i) willfulness not established."

In substance, defendant's assertions are that the evidence was insufficient to support the verdict and that evidence was admitted which was irrelevant and should have been excluded.

We have carefully reviewed the evidence in the light most favorable to Government and conclude that the net worth method was applied to defendant within the standards established in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) and there was sufficient evidence to support the jury's verdict.

*Inclusion by Government of assets of three separate corporate entities in defendant's net worth statement.*

Defendant's argument on this point is primarily concerned with Gibraltar Industrial. M.W.E. & S. conducted limited operations and defendant was given full credit in Government's net worth reconstruction for all income reported by M.W.E. & S. The exclusion from the net worth summary of the assets held in the name of Gibraltar Mutual would have reduced the total unreported income by only about 8%.

Gibraltar Industrial was chartered by the State of Indiana in 1920 and had offices in Indianapolis and Gary. The corporation had no stockholders. Defendant acquired an interest in it in 1947 and was chairman of the Board of Directors during the years named in the indictment (1956 through 1960). Defendant's sister, Mrs. Fannye Benford, was treasurer of Gibraltar Industrial during these years. She was responsible for the corporation's financial transactions. She received money coming into the corporation, paid all claims and bills, supervised employees and checked the bookkeeping.

During these years the president of Gibraltar Industrial was Bruce Mackey, Jr., a brother of defendant and the vice-president was Marion Davis, a son of defendant's uncle. The secretary from 1956 through 1957, William Mackey, is

504

a brother of defendant. The secretary from 1958 through 1960, Ardie Jenkins, is defendant's nephew.

Gibraltar Mutual, like Gibraltar Industrial, was chartered by the State of Indiana, had offices in Indianapolis and Gary, did not have stockholders and had defendant's above-named five relatives as officers during the years in question.

M.W. & E. Investment Co., Inc. was incorporated in Indiana in August, 1957. Early in 1959, the name was changed to M.W.E. & S. Investment Co., Inc. Until April, 1959, defendant and the three members of his immediate family (see footnote 1, supra) were the sole owners and officers of this corporation. On April 4, 1959, the corporation's minute book bore an entry indicating that 49% of the stock was being issued to certain named friends and relatives of defendant, including Benford, Jenkins, Marion Davis and Odie Davis (Marion Davis's father).

Harry Pettrie, a public accountant, testified that he prepared for Gibraltar Industrial the annual statements which are required for the Indiana Department of Insurance and federal income tax returns. He prepared these from Gibraltar Industrial's books and records which included the cash journal bank statements and canceled checks. The assets held in the name of Gibraltar Industrial which were included in Government's reconstruction of defendant's income did not appear on the corporation's books and records and were not listed on the annual statements or federal income tax returns. Pettrie testified he was never informed the corporation was acquiring assets in the form of real estate and securities.

Benford (defendant's sister) testified on direct examination that the corporation's books and records from which the statements and returns were prepared were complete as to the corporation's income and financial transactions. On cross-examination, she testified the corporation received substantial premium income which was not recorded on the books and records and which was used to buy the assets listed in Government's statement of defendant's net worth.

Government's prosecutor told the jury at least three times during his argument that if the jury believed Benford's testimony to the effect that these assets were purchased by unreported premium income of Gibraltar Industrial and Gibraltar Mutual, then the jury must find defendant not guilty.

The annual statements prepared by Pettrie for Gibraltar Industrial disclosed that during the years 1956 through 1960, Gibraltar Industrial averaged $55,000 per year in net premiums. The statements further showed that during these years the corporation paid out in death benefits and sick and accident benefits to policyholders an average of $16,352.06 per year. Thus according to the corporation's books and statements, it was annually paying out to policyholders an average of about 30% of its premium income. Defendant's argument that the assets in question were purchased by unreported premiums received by the corporation, if correct, would mean that policyholders were receiving in benefits approximately only 11% of the money they were paying as premiums.

■ This issue was properly submitted to the jury and there was ample evidence from which it could reasonably find that the assets in question were not purchased with income of the three corporations.

*Defendant's net worth at starting point.*

■ Government used the income tax returns of defendant and his wife from 1929 through December 31, 1955 as a guide in determining defendant's net worth at the starting point. The total income reported by defendant and his wife during these years was $181,465.77. Government did not deduct personal living expenses from this amount but did deduct the income taxes paid during this period, $22,306.04, leaving a balance of $159,159.73. Defendant's contentions that these income tax returns had no probative value, were irrelevant and were too remote, are without merit. The net worth of defendant and his wife at the starting point, December 31, 1955, in-

cluding assets held in the names of nominees, was computed by Government to be $361,461.52.

Defendant argues that "[t]he evidence conclusively established that the December 31, 1955 starting point (net worth) of $361,461.52 was *understated* by at least $62,721.65" and no amount of cash on hand was included for defendant.

Defendant states that the simple net worth statement which Government furnished defendant before trial established his net worth at the starting point to be $398,691.57 and that this figure properly includes $37,230.05, of which Government had knowledge, yet failed to include in its starting point net worth.

This net worth statement, which was introduced into evidence as Government's Exhibit 8, was, in essence, a bill of particulars. There is no merit in defendant's assertion that these items must be included in the starting point. There were several items contained in this statement, some of which favored defendant and some Government, which were not substantiated during the trial by admissible evidence. Government's starting point must be based upon items which are supported by evidence introduced during trial. It is certainly not unusual in cases of this type for the starting point as proved during the trial to vary from the bill of particulars or indictment which are prepared prior to trial.

Defendant asserts the following three assets were proved during trial, yet excluded from the net worth starting point:

"James Lees & Sons Stock..$ 2,841.76
W. F. Hall Stock........ 1,886.53
Central Indiana Gas Stock.. 7,187.70

Total ..................$11,916.99"

■ As to the first two items (Lees and Hall stock), evidence was introduced at trial that defendant bought them on November 30, 1954, but there was no evidence as to the purchase price or whether the stock was sold at any time. In the absence of such evidence, it was not error to exclude these items from the starting point.

■ The third item (gas stock) was an asset of defendant at the beginning and end of the prosecution years and could not have affected unreported income. Thus, exclusion of this asset would not be prejudicial error. Government's net worth summary did include 190 of these shares at a cost of $3,063.95. The other 550 shares were excluded due to the absence of evidence as to their purchase price.

■ Defendant argues that Government's Exhibit 805 demonstrates Gibraltar Industrial had $25,491.60 in cash at the starting point and this amount should have been included in defendant's net worth at the starting point. We disagree. It appeared that this amount had been invested in assets of Gibraltar Industrial by the end of 1955 and thus could not have been in the form of cash. Further, Gibraltar Industrial's annual statement showed that as of December 31, 1955, the "Cash in Association's Office" was $4,379.44. The burden of proving that Gibraltar Industrial's cash was more than this amount was on defendant. See United States v. Hornstein, 7 Cir., 176 F.2d 217, 220 (1949).

Defendant also argues there was evidence to show that Gibraltar Industrial had $590,506.12 in cash at the starting point. This argument is based upon testimony of Benford, defendant's sister, and Jenkins, defendant's nephew. The jury was entitled to disbelieve this testimony.

Government did not include any cash on hand in defendant's net worth at the starting date or at any point throughout the years in issue. Defendant claims this is prejudicial error.

Treasury agent Edward Harrington testified that investigation had not revealed any cash on hand at any time in the net worth period and that if he had included a figure for cash at the starting point such figure would have been purely arbitrary.

During the investigation, a treasury agent asked defendant if he had substantial amounts of cash on hand but defendant's attorney advised him not to answer the question.

▉ Whether defendant had substantial sums of cash at the starting point is a matter within defendant's knowledge. Under circumstances such as those in this case, where Government conducted a thorough investigation and failed to uncover evidence of cash on hand, the burden is on defendant to come forward with evidence of cash and he remains quiet at his peril. See Holland v. United States, 348 U.S. 121, 138–139, 75 S.Ct. 127, 99 L.Ed. 150 (1954) and United States v. Holovachka, 7 Cir., 314 F.2d 345, 354 (1963).

*Sufficiency of the evidence to support the inclusion by Government of certain assets in defendant's net worth.*

Defendant's brief lists several items which Government included in defendant's net worth. Defendant argues these should not have been included. Defendant urges exclusion of these items because of insufficient evidence to connect these assets to defendant or his wife, arbitrary evaluation of the value of some of these items by Harrington and lack of evidence that defendant or his wife owned certain property at the end of the indictment years.

▉ We have carefully examined each item listed and the contention made by defendant and find no prejudicial error in including these assets at their listed value in defendant's net worth. It would not serve any useful purpose to further lengthen this opinion by setting out the evidence pertaining to each item challenged by defendant.

Some of these items appear in defendant's net worth at the end of each year and thus could not affect any unreported income by defendant. Government's treasury agent Harrington testified concerning these items and explained why the assets were included and how their value was arrived at. While in some instances there was evidence contrary to

Government's evidence and Harrington's explanations, the issue of whether a specific asset was properly included in defendant's net worth was one of fact and properly submitted to the jury. Defendant makes the mistake of viewing the evidence in the light most favorable to him.

Defendant complains that Government did not offer evidence to show that he owned certain properties at the end of the years in question and argues that he *may* have sold these properties. He does not contend that he did sell them and his federal income tax returns did not list the sale of these properties. We find no error in the inclusion of these items in defendant's net worth.

*Sufficiency of Government's investigation, establishment of likely source of income and establishment of willful evasion of income tax.*

Defendant states Government is required to determine whether he and his wife received any loans, inheritances or gifts during the indictment years and whether defendant and his wife used a prior accumulation of funds during such years. He contends Government did not offer evidence that the above possibilities were investigated and that this constitutes prejudicial error.

▉ Government is required to investigate and negate "reasonable explanations *by the taxpayer* inconsistent with guilt" in order to establish its proof in a net worth theory case. Holland v. United States, 348 U.S. 121, 135, 75 S.Ct. 127, 135 (1954). (Emphasis added.) However, defendant in this case did not furnish any explanation which would attribute his increased net worth to other than taxable income. Defendant had the right to remain silent but he did so "at his peril." Id. at 139, 75 S.Ct. at 137.

▉ Defendant stated "[t]here was no direct evidence of * * * a likely source of current taxable income for each of the years 1956 through 1960." Defendant concedes that he was a policy wheel operator during the years in ques-

tion. There was no direct evidence that any of defendant's alleged unreported income was obtained from his policy wheel operation. Direct evidence is not required. "[P]roof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient." Id. at 138, 75 S.Ct. at 136. The following language in United States v. Costello, 2 Cir., 221 F.2d 668, 671–672 (1955), affirmed, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 is applicable: "There was no difficulty in the case at bar in pointing to such a [likely] source. By his own admission * * * [defendant] was a gambler * * *. * * * Gambling is an occupation with indeterminate possibilities * * *."

Defendant argues in the alternative that assuming, *arguendo*, he failed to report taxable income for the indictment years, Government did not prove such failure to be willful.

The Supreme Court in Spies v. United States, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (1943) said that "willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal." In light of this language and evidence introduced at the trial, e. g., recording of defendant's personal transactions on the books of Gibraltar Industrial and defendant's acquisition of property and putting title in the name of Gibraltar Industrial, we hold there was sufficient evidence from which the jury could reasonably find willfulness.

*Harrington's testimony.*

Defendant asserts that Government's expert witness, treasury agent Harrington, "usurped the exclusive function of the jury by weighing the evidence

and determining its credibility" and he was, in effect, a "13th juror."

He testified at length concerning, *inter alia*, the assets which Government included in defendant's net worth at the starting point and end of each indictment year. Such evidence and explanatory testimony is admissible in cases of this type to aid the jury in understanding a complex fact situation. United States v. Johnson, 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943). See United States v. Doyle, 7 Cir., 234 F.2d 788, 794 (1956), cert. denied, 352 U.S. 893, 77 S.Ct. 132, 1 L.Ed.2d 87. We have read Harrington's testimony and do not find its admission to constitute prejudicial error.

### III

Defendant raises various other issues, *inter alia*, whether the indictment was defective; whether the trial judge improperly admitted certain evidence; whether the jury was prejudiced by defendant's brother being called as a witness when Government allegedly knew he would plead the Fifth Amendment; whether the court erred in charging to defendant the cost of the court's copy of the transcript; and whether certain instructions were erroneous. We have carefully considered these and all other issues raised by defendant and find no prejudicial error.

In sum, Government introduced evidence from which the jury could reasonably find that defendant and his wife reported $181,465.77 on their income tax returns from 1929 through 1955; that their net worth as of December 31, 1955, including assets held in the names of nominees, was $361,461.52; that their net worth five years later was $1,519,-744.05; that during this five-year period they reported only $143,339.24 of taxable income on their returns; that a likely source of this unreported income was defendant's policy wheel operation and that failure to report this income was willful.

We hold there was sufficient evidence to support the jury's verdict and no prejudicial errors were committed be-

fore or during the trial as would require a reversal of the judgment of conviction. Defendant received a fair trial.

The judgment of conviction appealed from is affirmed.

Affirmed.