JOSEPH KRAMPF and ROSALIE L. KRAMPF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Krampf v. Comm'r
Docket No. 8341-78 United States Tax Court
T.C. Memo 1983-382; 1983 Tax Ct. Memo LEXIS 405; 46 T.C.M. (CCH) 627; T.C.M. (RIA) 83382; June 28, 1983. *405 Held, respondent's reconstruction of petitioners' income based on the net worth method for the years 1965 and 1966 sustained. Held,further, respondent failed to prove that any part of the underpayments was due to fraud on the part of Rosalie and she, therefore, is not liable for the additions to tax for fraud determined by respondent. A. J. Kalfus, for the petitioners. Stephen M. Friedberg, for the respondent. IRWIN
*406 MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in and additions to the Federal income taxes of petitioners Joseph Krampf (hereinafter Joseph) and Rosalie L. Krampf (hereinafter Rosalie) for the calendar years 1965 through 1969 as follows: Additions to Tax
Year
Deficiency
[1] Sec. 6653(a) Sec.6653(b)
1965
$7,014
$3,507
1966
18,924
9,462
1967
486
$159.00
1968
1,147
346.80
1969
3,084
355.00
Petitioners have conceded that they are liable for the deficiencies and additions to tax determined by respondent for the calendar years 1967, 1968, and 1969. Petitioners also *407 have conceded that the conviction of Joseph for income tax evasion estops him from denying fraud for the years 1965 and 1966. The issues remaining for decision are: (1) whether petitioners omitted taxable income from their joint Federal income tax returns for 1965 and 1966 in the amounts determined by respondent and (2) whether Rosalie is liable for any deficiency for 1965 and 1966 and/or for any additions to tax under section 6653(b) for such years. FINDINGS OF FACT Joseph and Rosalie, husband and wife, filed joint Federal income tax returns for the calendar years 1964 through 1974. At the time of filing their petition, they resided in Norfolk, Virginia. Queens Confectionery, Inc. (hereinafter Queens), was incorporated on or about July 21, 1960. Before its incorporation, Queens was a sole proprietorship owned by Joseph's uncle, Manuel Krampf (hereinafter Manuel).Queens had 200 shares issued, which were held by the following individuals: Number of
Name of Holder
Shares Held
Manuel
100
Anne Krampf
50
Rosalie
50
Rosalie was Secretary and Treasurer of Queens between 1961 and 1966. During 1964, 1965, and 1966, Queens operated a restaurant *408 and tavern located in Norfolk, Virginia. On January 7, 1964, a fire, which completely gutted the building, occurred at Queens' restaurant and tavern. As a result of the fire, Queens was closed for approximately 8 months. Sometime before the fire, the upstairs area of Queens was a hotel.During Queens' remodeling, the upstairs area was converted into a nightclub or lounge with live music 6 nights a week.The downstairs area remained a cafe and tavern. Joseph was the manager of Queens from 1960 until it was sold in 1972. Joseph's primary source of income he earned during 1965 and 1966 was from Oueens. Joseph took money from Queens' pool tables and juke box during 1965 and 1966, which was not reported on Queens' tax returns and petitioners' tax returns for such years. On July 6, 1964, while the restaurant and tavern was closed, petitioners borrowed $3,500. Petitioners made monthly payments on that loan during the years in issue. During 1965 and 1966, Rosalie worked at Queens' restaurant and tavern 4 days a week from 8:30 p.m. or 9:00 p.m. to 1:00 a.m. Rosalie worked as a hostess, a cashier, or a waitress, depending on how she was needed to help. As a stockholder and officer *409 of Queens, Rosalie attended the annual meetings of its stockholders and the annual meetings of its directors. The only actions that the minutes of the annual meetings of the stockholders of Queens for the years 1962 through 1966 report as having been taken at the meetings are the ratification and confirmance of "actions of the officers and directors since the last meeting of the stockholders" and the election of Manuel, Anne Krampf, and Rosalie as directors of Queens. The only actions that the minutes of the annual meetings of the directors of Queens for the years 1963 through 1966 report as having been taken at the meetings are the election of Manuel as president, Anne Krampf as vice president, and Rosalie as secretary-treasurer, a discussion of the business affairs of the corporation (without taking any action thereon), and a reading of the minutes of the annual meeting of stockholders that took place just before the directors' meeting. A document introduced into evidence by the parties as a joint exhibit pursuant to their oral stipulation reads, in pertinent part, as follows: THIS AGREEMENT, Made this 31st day of December, 1964, by and between PARK RESTAURANT, INCORPORATED, *410 JOSEPH KRAMPF and MANUEL KRAMPF, hereinafter called Vendors, and DORIS M. CHRISTMAS and JOE L. BAZEMORE, hereinafter called Vendees. WITNESSETH:
1. That for and in consideration of the payment by the Vendees to the Vendors of the sum of SEVENTY FIVE HUNDRED DOLLARS, ($7,500.00), as hereinafter set forth, the Vendors do sell to the Vendees all of the outstanding stock of Park Restaurant, Incorporated, a Virginia corporation. Vendees warrant and represent that the stock so transferred is all of the issued and outstanding stock of Park Restaurant, Incorporated. Settlement date is to be as of the date of this agreement. 4. Vendees will with the signing of this agreement pay to the Vendors the sum of Six Thousand Dollars ($6,000.00), Vendors acknowledging receipt of the said Six Thousand Dollars ($6,000.00) by signing hereunder. Vendees agree that the stock hereby purchased is to be held in excrow by Frederick T. Stant, Jr., Trustee, which said stock is to be held for the faithful performance of the payment of the said Fifteen Hundred Dollars ($1,500.00). WITNESS the following signatures and seals: PARK RESTAURANT, INCORPORATED BY /s/ Manuel Krampf, President *411 ATTEST: /s/ Rosalie Krampf, Secretary Joseph Krampf (SEAL) /s/ Manuel Krampf Manuel Krampf (SEAL) /s/ Doris M. Christmas Doris M. Christmas (SEAL) /s/ Joe L. Bazemore Joe L. Bazemore (SEAL) Petitioners did not report a sale of the stock of Park Restaurant, Inc., on any of their income tax returns for the years 1964 through 1974, inclusive. On December 31, 1964, petitioners had a $10,000 investment in Nationwide Grocery Credit Plan, Inc. The investment became worthless during 1965. Petitioners deducted the loss resulting therefrom as a loss on section 1244 stock on their 1965 income tax return. Petitioners reported income from wages and salaries of $9,750 on such return. Joseph had authority to draw checks on Queens' checking account. During April 1966, a check for $2,500 payable to petitioners' daughter, Marion Faye Krampf, was written on Queens' corporate account and was signed by Joseph.
On December 30, 1966, petitioners purchased 500 shares of American Motors Corp. stock from Merrill Lynch, Pierce, Fenner & Smith, Inc. (hereinafter Merrill Lynch). By check dated December 29, 1966, petitioners paid Merrill Lynch $4,052.01 for the stock. Merrill *412 Lynch received the check on December 30, 1966. During the years 1960 through 1965, Rosalie maintained a checking account at Southern Bank of Norfolk in the name of "Mrs. Gordon Krampf." [2] On December 29, 1965, she changed the name of the account to "Mrs. Rosalie Krampf." Joseph and Rosalie maintained no checking account other than Rosalie's checking account at Southern Bank of Norfolk.During 1965 and 1966, Rosalie made the following deposits of currency to her checking account on the dates indicated: Date
Amount of Currency
January 4, 1965
$134
September 10, 1965
786
August 23, 1966
7,000
October 17, 1966
544
December 21, 1966
915
December 29, 1966
6,200
On August 24, 1966, Rosalie wrote two checks for $3,500 each payable to Joseph. Each check was endorsed by Joseph and then endorsed by Merrill Lynch. On December 29, 1966, Rosalie wrote the check mentioned above for $4,052.01 payable to "MLPF&S," i.e., Merrill Lynch. During 1965 and 1966, Rosalie deposited the following amounts of currency to a savings account maintained by her at Norfolk Federal Savings & Loan Association: Date
Amount of Currency
March 24, 1965
$200
July 19, 1965
700
November 19, 1965
225
December 10, 1965
1,000
January 12, 1966
520
February 2, 1966
208
March 3, 1966
346
July 1, 1966
925
September 27, 1966
700
October 25, 1966
450
*413 During the years 1965 and 1966, Rosalie earned income by selling Avon Products. Petitioners' income tax returns for such years were prepared by a certified public accountant on the basis of information submitted by Joseph. Rosalie gave Joseph information concerning the income she earned by selling Avon products, so that he could supply such information to the certified public accountant who prepared petitioners' returns. The income Rosalie earned by selling Avon products was not reported on petitioners' joint income tax returns for 1965 and 1966. Rosalie signed her name on both returns without reviewing them. Petitioners' bases in assets liabilities, and net worth as of December 31 for each of the years listed are as follows: ASSETS
1964
1965
1966
Cash on Hand
[3] $ 134.00
[4] $ 9,080.75
[5] $ 16,655.09
Cash in Checking Account
717.38
167.81
2,781.72
Cash in Savings & Loan
Associations
1,044.87
22,570.44
13,508.52
Investments
Stock of Queens
3,950.00
3,950.00
3,950.00
Stock of Harold's Quick
Lunch
7,022.76
Fundamental Investors
67.65
3,111.96
6,492.94
Dreyfus Fund
10,040.80
25,717.03
Stock of Nation-Wide Check
Corp.
1,500.00
1,500.00
1,500.00
Stock of Nationwide Grocery
Credit Plan, Inc.
10,000.00
Shares in Investors
Accumulation Plan
666.15
Certificate in Mortgage and
Development Corporation
40,000.00
Stock of American Motors Corp.
4,075.00
Real Estate
38,656.37
38,656.37
89,539.87
Interest in Krampf and Krampf
35,000.00
35,000.00
Total Assets
$98,093.03
$124,078.16
$204,886.32
*414 LIABILITIES
James E. Waller
$35,000.00
Homes Federal Savings &
Loan Association of
Norfolk, VA.
3,195.56
2,798.97
2,300.13
Mutual Federal Savings &
Loan Association of
Norfolk
3,549.09
2,949.17
2,312.27
Norfolk Federal Savings &
Loan Association
32.00
County Trust Company
13,979.35
13,590.53
13,183.17
Mr. Ruffin
4,500.00
2,500.00
New York Life Insurance Co.
71.25
2.98
2.98
Depreciation Reserve
12,225.00
14,075.00
8,400.00
Total Liabilities
$37,552.25
$35,916.65
$61,198.55
NET WORTH
60,540.78
88,161.51
143,687.77
Increase in Net Worth
$27,620.73
$55,526.26
*415 Petitioners incurred personal living expenses during the taxable years at issue in the following amounts: 1965
$8,485.94
1966
8,818.86
During 1966, petitioners incurred a nondeductible loss of $6,013.99. Federal income taxes in the amounts of $1,580 and $1,485.26 were withheld from petitioners' income during 1965 and 1966, respectively. Petitioners received Federal income tax refunds in the amounts of $699 and $1,580 in 1965 and 1966, respectively. Queens paid premiums on life insurance owned by Joseph in the amount of $651.53 in each of the years in issue. The computation of petitioners' adjusted gross income based upon the increases in their net worth as found herein is as follows: 1965
1966
INCREASE IN NET WORTH
$27,620.73
$55,526.26
ADJUSTMENTS TO INCREASE IN NET WORTH
Additions
Personal Living Expenses
8,485.94
8,818.86
Federal Income Taxes Paid
1,580.00
1,485.26
Nondeductible Portion of Capital Loss
6,013.99
Life Insurance Dividend from Queens
651.53
651.53
Gift to Daughter from Queens
2,500.00
Deductions
Federal Income Taxes Refunded
699.00
1,580.00
Nontaxable Portion of Capital Gain
240.81
Dividend Exclusion
120.40
200.00
TOTAL ADJUSTMENTS
$ 9,657.26
$17,689.64
CALCULATED ADJUSTED GROSS INCOME
37,277.99
73,215.90
*416 On their Federal income tax returns for 1965 and 1966, petitioners reported their adjusted gross income as $692.38 and $11,170.33, respectively. Special Agent Robert E. Widener (hereinafter Widener) of the Internal Revenue Service was assigned to examine petitioners' Federal income tax returns for the years in issue. Pursuant to his investigation, he attempted to interview petitioners and sent to their attorney a list of questions to be answered by them. On the recommendation of their attorney, petitioners refused to be interviewed and to answer the questions, asserting their privilege against self-incrimination under the Fifth Amendment. OPINION Amount of Unreported Income
Petitioners contend that respondent has made several errors in the reconstruction of petitioners' income for the years in issue.
Respondent has used the net worth method [6] to determine petitioners' taxable income for the years 1965 and 1966. Respondent's computations are presumed correct and petitioners have the burden of disproving them. See Vassallo v. Commissioner,23 T.C. 656 (1955). Petitioners advance five specific objections to respondent's computations, which we shall *417 discuss below. Cash on hand on December 31, 1964. Petitioners contend that the December 31, 1964, net worth statement prepared by respondent is inaccurate in that it reflects cash on hand of only $134 and not the $30,000 they claim to have actually had. Joseph's own testimony was to the effect that he had approximately $30,000 in currency on hand at the end of 1964 and that he kept some of that currency at his home and some of it at Queens. He testified *418 that he inherited a gold watch and $21,000 in cash from his father, who died in April 1961. He further testified that his father, who lived with petitioners from 1957 until 1961, kept the $21,000 cash in a drawer in his room. According to Joseph, he always had "a lot of cash accumulated" because he "never believed in banks," but, as a result of friends talking to him about certain interest bearing bank accounts, in 1965 he began putting his money in banks. Both Rosalie and Joseph testified to the effect that Rosalie inherited $13,000 in cash from her father, Abraham Gordon, who died in September 1965. Rosalie did not testify at Joseph's criminal trial for tax evasion when he faced a possible jail term. On brief, petitioners indicate that two transactions which took place in 1963 also produced part of their alleged cash hoard: (1) the receipt of $11,463.96 by Joseph, as trustee for Rosalie, upon the redemption of shares of a mutual fund and (2) a withdrawal by Joseph of $5,678.23 from a savings account at Norfolk Savings & Loan Association. To support their argument concerning the cash hoard, petitioners presented the testimony of Herman Cohen. Mr. Cohen testified that he *419 has known Joseph since Joseph was a small boy, when he and Joseph played basketball together, and that, from 1956 or 1957 until Queens was sold (in 1972), Joseph purchased mutual funds, which he was selling. Mr. Cohen stated that in 1962 or 1963 Joseph asked him to come to his home and that when he arrived at Joseph's home, Joseph gave him a paper bag which contained $15,000 in bills of $10 and $20 denominations. Mr. Cohen reported that Joseph asked him to hold the money until he returned home from a trip out of town, and that Joseph was afraid that while he was away "someone wold break in to his home and steal it." Finally, Mr. Cohen testified that in 1965 and 1966, when Joseph invested in the mutual funds he was selling, he saw money in a safe at Queens, which he observed to be subject to only Joseph's control. According to Mr. Cohen, the money was in packages of $10 and $20 bills. Mr. Cohen estimated that there was a total of $20,000 in the safe. After careful consideration of the entire record, we are not convinced that the testimony concerning the existence of a cash hoard is credible. First, since the record discloses that Joseph began investing in mutual funds in 1956 *420 or 1957, we think it improbable that a disbelief in banks would have caused him to keep $30,000 idle, forgoing a return on it. Second, although we are cognizant that businessmen do borrow money when they do not need to in an absolute sense, see Estate of Mercure v. Commissioner,T.C. Memo. 1969-206, affd. 448 F.2d 922 (6th Cir. 1971), petitioners' borrowing of $3,500 on July 6, 1964, with no explanation in the record, tends to contradict petitioners' contention concerning the existence of a hoard of $30,000 in cash 6 months later. See Davis v. Commissioner,239 F.2d 187 (7th Cir. 1956), affg. a Memorandum Opinion of this Court. Third, Joseph's failure to offer the testimony of Rosalie regarding the inheritance of cash from her father at his criminal trial for tax evasion leads us to conclude that the testimony regarding the inheritance is a recent concoction, which is not to be believed.[7] We note that in judging Joseph's credibility we have also taken into account his conviction for income tax evasion, Fed. R. Evid. 609, and his testimony concerning his failure to report as income money taken by him out of the pool tables and juke *421 box at Queens in 1965 and 1966. Mr. Cohen's testimony concerning Joseph giving him $15,000 in cash to hold is difficult to believe. Although the fact that Mr. Cohen and Joseph were business acquaintances and long-time friends lends some credence to Mr. Cohen's testimony, it also diminishes the value of Mr. Cohen's testimony as disinterested corroboration of petitioners' cash hoard contention. This Court is not bound to accept testimony of long-time friends, even if it is not expressly contradicted. See Gatling v. Commissioner,286 F.2d 139, 142-143 (4th Cir. 1961), affg. a Memorandum Opinion of this Court. Moreover, Mr. Cohen's testimony concerning the $15,000 that Joseph allegedly gave him to hold in 1962 or 1963 lacks probative value on the question of how much cash petitioners had on hand on December 31, 1964. Any cash hoard may well have been depleted as a result of Queens' closing for 8 months during 1964. Finally, we agree with respondent that although Mr. Cohen knew that Joseph had access to the safe at Queens, he had "no reason to know whether Rosalie, Manuel or Anne also had *422 access to the safe." Receivable, Park Restaurant, Inc. According to petitioners, Joseph sold his shares of Park Restaurant, Inc.'s stock on December 31, 1964. Petitioners claim that respondent, as a result of such sale, should have reflected an account receivable of $3,750 (one-half of the sale price of $7,500 purportedly paid for all the shares of Park Restaurant, Inc.'s stock) on petitioners' net worth statement for December 31, 1964. Petitioners primarily rely upon the purported agreement set forth in our findings. The exhibit introduced into evidence required the named buyers to pay $6,000 of the stated price of $7,500 on December 31, 1964, leaving a remaining balance of only $1,500 unpaid as of December 31, 1964. Beyond this, although the document contains a place for Joseph's signature, it is not signed by him and no evidence was introduced to explain his failure to sign it. Based on this record, we are unable to conclude that there was an outstanding receivable of $3,750 due to petitioners on December 31, 1964. Treatment of 1965 wages of $9,750. Petitioners would have us treat income from wages of $9,750 reported by them on their joint Federal income tax *423 return for 1965 as a non-taxable item and, therefore, adjust the amount of increase in their net worth for 1965 by deducting $9,750. To support their position, petitioners presented the testimony of a certified public accountant, who asserted that since the wage income of $9,750 is offset by a loss on section 1244 stock of $10,000, the wage income is, in effect, a nontaxable item. We disagree with petitioners. Respondent included the $100,000 of stock, which became worthless during 1965, in petitioners' assets as of the end of 1964 and then eliminated it as of the end of 1965. Thus, the increase in petitioners' net worth computed by respondent for the year 1965 is $10,000 less than it would be if this particular item had not been so treated on the net worth statement. To permit petitioners to deduct $9,750 from the increase in their net worth for the year 1965 would be, as respondent puts it, to allow them "an unwarranted second deduction." Adjustment to net worth for check from Queens. Petitioners challenge respondent's adjustment of $2,500 to their 1966 net worth increase for a check written on Queens' corporate account payable to their daughter, Marion. Petitioners *424 do not deny that during April 1966 a check payable to Marion was written on Queens' account and signed by Joseph. They claim, however, that the check was not negotiated. Joseph testified that the check in question was given to petitioners' daughter at the time of her expected wedding. Joseph stated that he did not think the check was ever "cashed," although he did not remember "what happened to the check," but he did know that his daughter did not get the money since the wedding was canceled. Joseph then testified to the effect that his daughter was unable to negotiate the check, because, by mistake, he had entered on the check the words for $2,500 and the figures for $25. While Joseph's explanation of this item taxes our credulity, its unacceptability is further diminished by our assessment of his credibility. Joseph'e presentation of two stories as to why the check was not negotiated, coupled with his claim of a lapse of memory as to "what happened to the check," leaves us suspecting that Joseph deliberately fabricated his testimony on this point. We further note that petitioners did not call their daughter as a witness or present any documentary evidence, such as a marriage *425 certificate, to substantiate when she married. Petitioners not having established when their daughter married, a fact reasonably within their control or reach, we must presume that had they produced evidence as to the date of her marriage it would have been unfavorable to them. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Liabilities, Merrill Lynch. Petitioners assert that as of December 31, 1966, they owned Merrill Lynch $4,052.01. They complain that respondent failed to reflect their liability to Merrill Lynch on the net worth statement he prepared for December 31, 1966, thereby erroneously increasing petitioners' net worth by $4,052.01. Respondent counters that the documentary evidence before us indicates that, on December 30, 1966, Merrill Lynch was in receipt of petitioners' check for $4,052.01 issued in satisfaction of their liability and, thus, the liability was extinguished before December 31, 1966. Respondent also points out that, in determining petitioners' checking account balance as of December 31, 1966, he deducted the check for $4,052.01, which was outstanding on *426 said date. Respondent contends that if we should find that petitioners owned Merrill Lynch $4,052.01 on December 31, 1966, then the same $4,052.01 must be included in petitioners' year-end checking account balance and, accordingly, the amount of petitioners' net worth would be unchanged. As indicated in our Findings, the check for $4,052.01 was dated December 29, 1966, and received by Merrill Lynch on December 30, 1966. A check is regarded as conditional payment subject to the condition that it will be honored; and if the check is honored by the drawee when presented, the time of its delivery is regarded as the date of payment. Broussard v. Commissioner,16 T.C. 23 (1951); Estate of Spiegel v. Commissioner,12 T.C. 524 (1949).We, accordingly, conclude that the total amount petitioners owed Merrill Lynch on December 31, 1966, was zero and that respondent properly reduced petitioners' year-end checking account balance by the amount of the outstanding check. See Wardy v. Commissioner,T.C. Memo. 1966-210, affd. 396 F.2d 792 (5th Cir. 1968). Cf. Clark v. Commissioner,253 F.2d 745 (3d Cir. 1958), *427 affg. in part and revg. in part, and vacating and remanding in part a Memorandum Opinion of this Court; United States v. Vardine,305 F.2d 60, 65 (2d Cir. 1962). Finally, petitioners seek solace in the contention that respondent has failed to establish a likely source of unreported income and to negate the existence of all possible nontaxable sources. Petitioners' assertion concerning respondent's failure to negate the existence of all nontaxable sources of funds is totally without merit. In this regard, what we said in Singleton v. Commissioner,T.C. Memo. 1977-98, affd. 606 F.2d 50 (3d Cir. 1979) is relevant: The [Supreme] Court further stated [in Holland v. United States,348 U.S. 121 (1954)] that "where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant * * *." Thus, a taxpayer cannot complain about the sufficiency of the Government's investigation where he has offered no leads at all.In United States v. Mackey,345 F.2d 499 (7th Cir. 1965), the taxpayer maintained *428 that it constituted prejudicial error for the Government not to have offered evidence relating to whether its agents had checked to determine whether he had received any loans, inheritances, or gifts during the indictment years. Citing Holland,supra, the Seventh Circuit held that the Government was only required to investigate and negate "reasonable explanations by the taxpayer inconsistent with guilt" and that the taxpayer had the right to remain silent but did so "at his peril." Mackey, at 506. In the case before us, petitioners offered the Government no leads which it was required to investigate. The responsibility for any failure to investigate must, therefore, rest with petitioners. See also United States v. Mastropieri,685 F.2d 776, 784 (2d Cir. 1982). In addition, petitioners' attempts on brief to establish that respondent's investigation was inadequate are unpersuasive and only serve, in many instances, to distort the testimony of Revenue Agent Widener. [8] Finally, we recently held that the "lead-check rule" was inapplicable in circumstances, such as those present here, in which the burden of establishing the absence of *429 a deficiency is on the taxpayer. See Tunnell v. Commissioner,74 T.C. 44, 57 (1980), affd. 663 F.2d 527 (5th Cir. 1981). Contrary to petitioners contention, respondent has established a likely source of income in excess of that reported on petitioners' income tax returns for 1965 and 1966: namely, Queens. Joseph admittedly took from the juke box and pool tables at Queens "maybe $100 a week," which was not reported on Queens' and petitioners' income tax returns for the years in issue. However, petitioners, in essence, assert that the amount of unreported income taken by Joseph from Queens could not possibly be as great as the amount of unreported income determined by respondent. In support of such assertion, Joseph testified that whatever he took from Queens was also taken by Manuel *430 from Queens and that Queens could not possibly have generated the "kind of money" reported on its returns plus twice as much as the amount determined by respondent to be omitted from petitioners' returns. It is incumbent on petitioners to prove that respondent's determination of the amount of income omitted from their returns is erroneous. Tunnell v. Commissioner,supra (wherein the taxpayer conceded that he was collaterally estopped to deny fraud as a result of his criminal conviction). [9] Joseph's conclusory statements concerning the income-generating capability of Queens fail to satisfy this burden placed on petitioners. To overcome the presumption of correctness of respondent's determinations, petitioners were required to establish that the perceived increases in their net worth were, in part, attributable to a nontaxable source of funds. They have failed to do so. *431 Rosalie's Liability
Finally, we consider the question of Rosalie's liability. Rosalie first contends that assessment and collection of the deficiencies and additions to tax is barred as to her by the running of the statute of limitations. However, under section 6501(c)(1), the tax may be assessed and collected at any time "[i]n the case of a false or fraudulent return." Petitioners have conceded that Joseph is estopped from denying fraud for the years 1965 and 1966. That fraud of Joseph prevents the running of the statute of limitations against Rosalie, so that she remains liable with her husband for the deficiencies for 1965 and 1966. S. Rept. No. 91-1537, 91st Cong., 2d Sess. (1970), 1971-1 C.B. 606, 608; Stone v. Commissioner,56 T.C. 213, 228 (1971). See Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970). [10]
For the first time in petitioners' brief, Rosalie argues that she is an innocent spouse within the meaning of section 6013(e)(1) and, therefore, relieved from liability for *432 the deficiencies in tax for the years 1965 and 1966. Since Rosalie's argument was not raised in petitioners' pleadings, it is not properly before us. See Markwardt v. Commissioner,64 T.C. 989 (1975), Rule 39. In any event, there is not sufficient evidence before us to establish that Rosalie is an innocent spouse. To be relieved from liability under section 6013(e), as an innocent spouse, Rosalie must establish that each condition set forth in that provision is satisfied. Adams v. Commissioner,60 T.C. 300, 303 (1973). One of the facts that Rosalie must prove is that she did not know, and had no reason to know of, the omissions from gross income at the time of signing the returns. See section 6013(e)(1)(B). We have no evidence as to Rosalie's knowledge as of the time she signed the returns. Rosalie finally argues that, under section 6653(b), she is not liable for the additions to tax for fraud, since no part of either of the underpayments was due to fraud on her part. Section 6653(b) requires that we find that some part of the underpayments is due to the fraud of Rosalie in order to find her liable for the additions to tax for fraud. See *433 Hicks Co. v. Commissioner,56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972). The burden of proving fraud is on respondent, and he must establish it by clear and convincing evidence. Section 7454(a); Rule 142.The existence of fraud is a question of fact to be determined from consideration of the entire record before us. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be presumed or imputed. Carter v. Campbell,264 F.2d 930 (5th Cir. 1959). To establish fraud, respondent must show that the taxpayer deliberately intended to evade taxes, which he knew or believed he owed, by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941); Danenberg v. Commissioner,73 T.C. 370, 393 (1979). Bearing the preceding admonitions in mind, we conclude that respondent has failed to prove by clear and convincing evidence that any part of the underpayments *434 were due to fraud on the part of Rosalie. We decline to infer, as respondent asks us to do, that, since Rosalie was a 25-percent owner of Queens and since she attended meetings of its shareholders and directors and worked 4 days a week as a hostess, waitress, or cashier at Queens, she knew of the unreported income. [11] Rosalie's work for Queens did not necessarily require her to know the disposition of juke box and pool table receipts. At trial, respondent questioned neither Rosalie nor Joseph as to Rosalie's knowledge of the disposition of such receipts. In addition, a reading of the minutes of the annual meetings of the shareholders of Queens and of the annual meetings of the directors of Queens fails to convince us that Rosalie learned about the unreported income at such meetings. At best, Rosalie's relationship to, and work at, Queens evinces a possibility that she might have had knowledge concerning the omitted income. It is not clear and convincing evidence that Rosalie did know about the omitted income. A taxpayer's failure to report and pay *435 tax on income deposited to a bank account opened by him in a name other than the one he normally uses is an indicia of fraud. Estate of Beck v. Commissioner,56 T.C. 297, 366 (1971). Rosalie's maintenance of a checking account in the name of "Mrs. Gordon Krampf" must therefore be viewed by us with a suspicious eye. Nevertheless, we must be convinced of fraud not merely suspect it. We cannot conclude that Rosalie's depositing of money in an account under the name of "Mrs. Gordon Krampf" is an indication of fraud, absent evidence that she used that name to conceal petitioner's true income. [12] Rosalie's deposits of currency to the checking account do not by themselves evidence an intent to conceal income. Respondent has presented no evidence as to the source of the cash deposited. Even assuming, as respondent apparently has done, that Rosalie received all or a portion of the cash from Joseph, what, if anything, Joseph told Rosalie concerning the source of the cash is not disclosed by the record before us. Neither does Rosalie's drawing of three checks totaling over $11,000, which she should have known were to be used for investment purposes, satisfy us of her intent *436 to conceal income. There is no evidence that the funds invested were derived from a source which Rosalie knew to be taxable but unreported. Moreover, more than 7 months before Rosalie drew the first two checks used for investment purposes, Rosalie had the name on her checking account changed from "Mrs. Gordon Krampf" to "Mrs. Rosalie Krampf." Finally, we can draw no inference in favor of respondent from the unavailability of canceled checks drawn on the checking account. There is no evidence that they were deliberately destroyed or concealed and respondent has requested no findings of fact with respect to their unavailability. *437 As indicated by our Findings, we have accepted as true Rosalie's testimony that she gave Joseph information concerning the income she earned by selling Avon products, which Joseph who to supply to the certified public accountant who prepared petitioners' tax returns. Although Rosalie's signing of petitioners' 1965 and 1966 income tax returns which contain no reference to the income she derived by selling Avon products was negligent on her part, based on the totality of the circumstances in this record and our observation of Rosalie as a witness, we are unable to find that her conduct was motivated by a fraudulent intent. Finally, in attempting to prove fraud on the part of Rosalie, respondent points out that while Rosalie reported a salary received from Queens on petitioners' tax returns for years subsequent to the years in issue, she reported no pay or tips for each of the years in issue. In this connection, respondent considers Rosalie's explanation of why she was not paid a salary in the years before us inadequate. [13]
*438 Before Rosalie can be found to have acted fraudulently by failing to report any pay or tip income in the years in question, it must be established that Rosalie received pay or tips for her own benefit during such years. The record is devoid of such proof. [14]
We admittedly suspect that Rosalie knew that petitioners' income exceeded the income reported on their returns for each of the years in question, but mere suspicion of fraud is insufficient. Ferguson v. Commissioner,14 T.C. 846 (1950). Evidence of negligence -- even gross negligence -- is likewise insufficient. Thurston v. Commissioner,28 T.C. 350 (1957); Ferguson v. Commissioner,supra.In short, we are not satisfied that respondent has carried his burden of proving fraud clearly and convincingly. In conclusion, we hold that both Rosalie and Joseph are liable for the deficiencies determined by respondent *439 for each of the years 1965 and 1966 and that Rosalie is not liable for the additions to tax for fraud for such years. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted. All references to Rules are to the Rules of Practice and Procedure of the United States Tax Court.↩
2. Rosalie's maiden name is Gordon.↩
3. On January 4, 1965, Rosalie deposited $134 in currency to the checking account she maintained at Southern Bank of Norfolk. Respondent considered the $134 to be on hand as of December 31, 1964. ↩
4. On January 6, 1966, Joseph deposited a total of $11,000 in currency to two savings accounts he maintained. Also on January 6, 1966, Joseph purchased a cashier's certificate for $40,000 from Mortgage and Development Corporation. On January 4, 1966, petitioners had received $41,919.25 upon the closing of the sale of certain property owned by Krampf and Krampf. Respondent determined petitioners had $9,080.75 ($11,000 + $40,000 - $41,919.25) on hand on December 31, 1965. ↩
5. Cash on hand as of December 31, 1966, is composed of checks bearing dates in 1966, but not deposited until 1967.↩
6. In reconstructing income by use of the net worth method, the difference between the taxpayer's net worth (assets at cost minus liabilities) at the beginning and end of each year is computed. This difference in the increase in the taxpayer's net worth. The increase in net worth in then adjusted by adding nondeductible expenses and by subtracting nontaxable receipts (such as loans, gifts, and inheritances) and statutory deductions allowed for items which have no impact on the change in the taxpayer's net worth during the applicable year (such as capital loss carryovers). Holland v. United States,348 U.S. 121, 125 (1954); United States v. Giacalone,574 F.2d 328, 330-331↩ (6th Cir. 1978).
7. See Olive v. Commissioner,T.C. Memo. 1983-195↩.
8. Petitioners, for example, try to discredit Revenue Agent Widener's investigation by claiming that he "failed to contact Joseph Krampf's personal bank Virginia National Bank [VNB]." In fact, Revenue Agent Widener testified that he did contact VNB, but obtained no copies of financial statements from VNB because "[t]here were no financial statements at [VNB]."↩
9. See Mandina v. Commissioner,T.C. Memo. 1982-34↩, on appeal in docket No. 1068-78 (11th Cir., May 12, 1983), in docket No. 3565-78 (2d Cir., May 16, 1983), and in docket No. 1944-78 (11th Cir., June 1, 1983), wherein we concluded that fraud on the part of the taxpayer-husbands made it incumbent on the taxpayers to prove that the amount of deficiencies determined by respondent were erroneous, despite our finding that no additions to tax for fraud were due by the taxpayer-wives.
10. See Amato v. Commissioner,T.C. Memo. 1977-305; Stone v. Commissioner,T.C. Memo. 1977-147↩.
11. See Jackson v. Commissioner,T.C. Memo. 1964-330, affd. 380 F.2d 661↩ (6th Cir. 1967).
12. See Ratner v. Commissioner,T.C. Memo. 1981-333 (holding that the taxpayer-wife qualified as an innocent spouse pursuant to section 6013(e), where she thought that her husband had her sign signature cards for bank accounts in names other than her own in order to protect assets from creditors, rather than to conceal income from the Internal Revenue Service); Hayes v. Commissioner,T.C. Memo. 1975-223 (holding that the taxpayer, Patricia S. Hayes, qualified as an innocent spouse pursuant to section 6013(e), although she followed her husband's directions to open a checking account, which was subsequently used by her and her husband as a personal account, in the name of "Saad Investments" and to sign the signature card in her maiden name, Patricia A. Saad. (She accepted whatever her husband told her concerning the source of funds he gave her to deposit to said account.)); Nigra v. Commissioner,T.C. Memo. 1968-273 (under all other circumstances, the use of other names was not a badge of fraud); and Alexander v. Commissioner,T.C. Memo. 1967-6↩ (holding that the taxpayer, Sidney Alexander, who used substantial amounts of cash, which the Court found could not have had as its source his taxable income for the years in issue or "a mysterious stranger," to purchase bank cashier's checks and Government bearer securities in a name other than his own (Lou Gross), was not liable for additions to tax for fraud, where the government failed to establish the source of the cash).
13. At trial, in response to a question posed by respondent's counsel as to why she received a salary in 1968 but not in prior years, Rosalie replied: The first two years I helped him out, and I guess he thought I deserved a salary. That's all I can think of.↩
14. That Rosalie may have worked without pay for Queens, a family-owned corporation, is certainly not inconceivable. Additionally, Rosalie's reporting of a salary for years after 1966 is not convincing evidence that she was paid a salary during 1965 and 1966.↩