GLENN A. DANIELS AND VIRGINIA E. DANIELS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Daniels v. Commissioner
Docket No. 3658-90
United States Tax Court
T.C. Memo 1992-692; 1992 Tax Ct. Memo LEXIS 742; 64 T.C.M. (CCH) 1439; December 7, 1992, Filed *742 Decision will be entered under Rule 155. For Petitioners: John Andrew Jones. For Respondent: Marilyn S. Ames and Richard L. Hunn. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies in petitioners' income tax of $ 32,836.90 for 1980 and $ 22,611.81 for 1981. Respondent also determined additions to tax for fraud under section 6653(b) for petitioner Glenn A. Daniels of $ 16,418.45 for 1980 and $ 11,305.90 for 1981. Respondent used a net worth analysis to determine petitioners' income. Petitioners agree with respondent's net worth analysis except for the amount of cash on hand on December 31, 1979. After concessions, the following issues remain to be decided: 1. Whether increases in petitioners' net worth were due to unreported income of $ 75,868.15 in 1980 and $ 52,968.84 in 1981 as determined by respondent, or were expenditures from a $ 170,000 cash hoard held on December 31, 1979, as petitioners contend. We hold that the increases in net worth were due to unreported income in the amounts determined by respondent. (a) Whether respondent's determination was arbitrary. We hold it was not. (b) Whether respondent adequately *743 investigated leads relating to petitioners' claimed cash hoard. We hold that respondent did. 2. Whether petitioner Glenn A. Daniels is liable for additions to tax for fraud for 1980 and 1981 under section 6653(b). We hold that he is. 3. Whether the period of limitations for assessment of tax expired before respondent issued the notice of deficiency. We hold that it did not. All references to petitioner in the singular are to Glenn A. Daniels. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated, and are so found. 1. Petitioners
Petitioners are married and lived in Corpus Christi, Texas, when they filed their petition. Petitioner was 64 years old at the time of trial. He left school in the 10th grade to make ball bearings for Hughes Tool Co. From 1944 through 1946, he served in the U.S. Navy. He later received a high school diploma equivalent from Edinburgh Junior College. He worked at his father's ice plant and laundry after he was discharged from the Navy. Around 1950, *744 he again served in the Navy until the summer of 1951. He worked in various jobs before getting into plumbing. Virginia Daniels (Mrs. Daniels) worked at petitioner's father's laundry, a concrete company, a drive-in, and various department stores before 1969. She apparently was not employed outside the home after 1969. Petitioners had four children, including two adult daughters, Janelle Delaney and Deborah Wood, who testified. Petitioner began working as a plumber in 1968. He worked alone for several years. In the early 1970s he formed a partnership, D & S Plumbing, with two other individuals. The partnership lasted until around 1974. Beginning around 1975, and continuing through the time of trial, petitioner operated a sole proprietorship known as Daniels Plumbing Co. (Daniels Plumbing). Most of Daniels Plumbing's business was subcontracting for new residential construction. The average time to complete a job was 90 to 120 days. Petitioner paid his workers in cash. He paid many of his business expenses with cash obtained from cashing his customers' checks, or by endorsing his customers' checks to his suppliers. Petitioner kept some funds on hand in either currency or *745 uncashed checks or both for his business. Petitioner carried these funds in a bank bag which he took home each night. There is no credible evidence in the record that the amount of cash and checks petitioner had on hand on December 31, 1979, differed materially from the amount on hand on January 1, 1982. Petitioners had a floor safe in their home during the years at issue. No one except petitioners ever saw cash in the floor safe. In May 1979, petitioners visited their daughter, Janelle Delany, in Colorado. On January 1, 1980, petitioner bought some radio equipment for $ 6,249.60. He paid $ 625.60 cash and financed the balance at a 16.2-percent interest rate. On February 21, 1980, petitioner bought a new Chevrolet Suburban truck for $ 10,700. He paid $ 1,200 in cash, and financed the balance at a 14-percent interest rate. On October 30, 1980, petitioner bought a new Chevrolet three-quarter ton pickup truck for $ 9,196.46. He paid no cash, but received a $ 4,500 trade-in allowance and financed the balance. 2. Petitioners' Financial Condition
In 1972, petitioner prepared and signed a financial statement for D & S Plumbing which stated that petitioners' net worth, *746 excluding D & S Plumbing, was $ 75,000; that their residence at 5818 Shamrock was valued at $ 22,500; and that their net worth, excluding that house, was $ 52,500. Around 1974, petitioner was the subcontractor for a large project on which he made no profit. As a result, petitioner owed several creditors that he could not pay. Several of those creditors sued him. The following judgment liens were filed against petitioner as the result of unpaid debts and were released upon payment as shown: DATE
CREDITOR
LIEN FILED
AMOUNT OF JUDGMENT
RELEASED
Ajax Plumbing
6-29-76
$ 6,349.86
4-4-84
Supply $ 500 attorney's fees
9% interest
Phoenix Supply
10-14-76
$ 693.29
10-14-76
$ 100 attorney's fees
9% interest
Wolverine Brass
12-23-76
$ 461.11
9-6-77
Works 6% interest
costs of suit
Oso Plumbing
9-9-76
$ 21,770.43
3-19-81
Supply $ 650 attorney's fees
9% interest
Texas Employment
$ 55
Commission
Diner's Club
8-3-77
$ 392.66
5-15-81
9% interest
costs of suit
Corpus Christi
6-5-79
$ 2,490.42
5-7-81
Independent School
District
Corpus Christi
$ 107.54 costs
College District
9% interest
State of Texas
6-6-79
$ 215.03
5-7-81
and County of
9% interest
Nueces
*747 Petitioner agreed with the City of Corpus Christi to pay $ 250 per week towards his delinquent tax account. By January 17, 1979, petitioner was $ 500 delinquent under this agreement. On July 31, 1979, petitioner owed $ 500.27 in school taxes on personal property of D & S Plumbing for 1975, 1976, and 1977. Petitioner tried to hide assets from his creditors who had judgment liens outstanding against him. For example, he placed some of his assets in his children's names. Petitioner's attorney at that time, Marvin Nebrat, told him that if he deposited funds in his bank accounts, his creditors could collect money from the accounts. During that time, Mr. Nebrat and petitioner discussed whether petitioner should file in bankruptcy. Mr. Nebrat also advised petitioner to pay the judgment liens, if petitioner could. Petitioner did not file for bankruptcy because he hoped that business would improve and he believed he could eventually pay the judgments. Mr. Nebrat once saw what appeared to him to be a substantial amount of cash in petitioner's bank bag. Mr. Nebrat believed petitioner had the cash to pay for supplies, expenses, or a subcontractor. He did not see the denominations *748 or whether the bills were banded or new. Petitioners' joint individual income tax returns for 1975 through 1981 show the following items for Daniels Plumbing on their Schedule C, and adjusted gross income: Adj. Gross
Year
Gross Sales
Gross Profit
Net Profit
Income
1975
$ 45,886.00 $ 5,639.90 $ (5,547.00) $ 6,422.67  1976
Reported as D & S Plumbing, no Schedule C
5,211.27 1977
362,173.74
112,520.43
(14,787.39)
(14,556.11)
1978
587,284.38
60,609.07
(14,044.18)
(13,542.97)
1979
686,136.96
83,449.30
(141.42)
196.84 1980
549,328:76
88,841.09
4,435.07 7,882.08 1981
777,138.34
117,838.26
(6,343.66)
2,423.32 Petitioner's business was not good in the late 1970s, but improved in 1980. Petitioner picked up payment checks from the contractors for whom Daniels Plumbing was working to get them faster. Petitioner thought that it was necessary to pick up the checks on a number of occasions in order to make the payroll. Business improved more in 1981, and petitioner began writing regular salary checks to himself. Petitioner signed a loan application on February 21, 1980, in which he listed no cash on hand, and incorrectly stated that *749 there were no unsatisfied judgments against him. The loan application did not specifically request information about cash on hand. However, it provided a space for listing other assets, where petitioner listed his trucks. Petitioner listed $ 2,500 as his monthly take-home salary. Petitioners' bank account balances, including certificates of deposit, totaled $ 56,318.76 on September 16, 1980. Petitioner signed a personal financial statement for Mercantile National Bank on September 16, 1980, in which he stated that his cash on hand and in banks was $ 56,289.80, and his take-home pay was $ 1,500 per month. The liabilities and net worth section of the form included lines for "Accounts and Notes Payable to Others" and "Other Liabilities (itemize)". He did not list any judgment lien creditors. 3. Petitioner's Books and Records
Petitioner kept the books and records for Daniels Plumbing. He was assisted by his wife, and in late 1981, by one of his daughters. During the years at issue, petitioner used a three-part invoice to bill some of the general contractors and other customers. Petitioner or one of his employees sent one part to the general contractor. They kept the *750 other two parts in a customer file. When the invoice was paid, they removed one copy from the customer file, stamped it paid, and placed it in a paid invoice file under the contractor's name. Petitioners kept a cash receipts and cash payments journal. Petitioner summarized items recorded in the journal on a yearly worksheet. Petitioner marked three lines on the last page of the 1980 cash receipts and cash payments journal "unlabeled sales" in amounts of $ 5,270, $ 10,000, and $ 11,000. 4. Petitioners' Income Tax Returns
Larry Patrick, an accountant, prepared petitioners' 1980 and 1981 income tax returns. Petitioner gave Mr. Patrick a sheet summarizing expenses and sales for Daniels Plumbing for each year, and information to compute petitioners' interest income and itemized deductions. Petitioners did not give Mr. Patrick access to any other documents to prepare their 1980 or 1981 returns. Mr. Patrick knew there were other records available, but he did not ask to see them. Petitioner told him that he would only need the worksheets. Mr. Patrick prepared the returns using the sheets petitioners gave him, and he made some reclassifications before transcribing the numbers *751 to the returns. For each return, Mr. Patrick called petitioner's attention to the fact that there were large gross sales and either small net profits or losses. For example, petitioner reported gross receipts of $ 777,138.34 in 1981, and a net loss of $ 6,343.66. Each year, petitioner told Mr. Patrick that was how the figures came out. Mr. Patrick also prepared a financial statement for petitioners, doing business as Daniels Plumbing Co., dated June 25, 1982, based on information petitioner gave him. The statement indicated that petitioners had $ 162,596.45 in cash and certificates of deposit. 5. The Audit
Respondent selected petitioners' 1981 income tax return for audit and assigned it to revenue agent Maxine Rael. She first contacted petitioners on February 3, 1983. Respondent later expanded the audit to include 1980. Ms. Rael was a new revenue agent. Alfredo Ochoa, an on-the-job instructor observed her in the initial interview with petitioner, and Mrs. Daniels may have been present. During the initial interview, Ms. Rael asked how the business was operated, and for copies of bank statements, books and records of the business, petitioners' tax returns, and a cash *752 on hand figure for the beginning of 1981. Ms. Rael told petitioners that cash on hand includes any cash on petitioner's person or in the cash register, in a hoard in the backyard, under a mattress, or any cash petitioner might have anywhere, including his residence, at the beginning of 1981. Petitioner originally stated that his cash on hand at the beginning of 1981 was $ 100 personal, $ 250 business, for a total of $ 350. He later increased this figure to $ 1,000 when the audit was expanded to include 1980. Petitioners told Ms. Rael during the course of the audit that they had personal living expenses of $ 18,000 in 1980 and $ 21,098 in 1981. During the initial interview, Ms. Rael could not reconcile petitioners' books and records for 1981 to their income tax return. When Ms. Rael asked petitioner about the discrepancies, he gave her a second set of books and records for 1980 and 1981 which had been recopied and which had adjustments at the year's end. There were large adjustments to sales at the end of the second set of books and records. Petitioner said the adjustments were necessary because some pages were missing. During the initial interview, petitioner said that he *753 deposited all his receipts into one of two bank accounts. When Ms. Rael looked at the bank records, she found that less than half of the receipts had been deposited. Petitioner then said he was cashing checks to conceal his finances from his creditors. Petitioner never told Ms. Rael that he held large amounts of uncashed customer checks at the beginning of 1980. Ms. Rael reviewed the payments to petitioner from one of the contractors. Ms. Rael tried to trace the payments to the books and records, and found that petitioner did not record many of them. As a result, gross income was not included in petitioner's books and records, and not reported as income. Petitioner told Ms. Rael that the unrecorded receipts were from previous years. After the initial interview, Mr. Ochoa suggested that Ms. Rael check for unreported income because she could not reconcile the books and records to the tax return. Ms. Rael contacted about 14 general contractors for whom Daniels Plumbing had worked to find out how much income had been paid to petitioner during 1980 and 1981. Ms. Rael received about seven or eight responses, including from U.S. Homes, Alfred Edge Homes, and Thompson Homes. Petitioner's *754 books and records understated his income from U.S. Homes by about $ 6,000 for 1980 and $ 12,000 for 1981. Income from Alfred Edge Homes was understated by about $ 12,000 for 1980 and $ 6,000 for 1981. Income from Thompson Homes was understated by about $ 7,000 for 1980, and overstated by about $ 2,000 for 1981. Ms. Rael received additional income figures from general contractors over the telephone which she could not reconcile to the books and records. Ms. Rael concluded that there was an understatement of gross receipts on petitioners' returns. One of Ms. Rael's supervisors recommended that she use an indirect method to compute petitioners' income for 1980 and 1981 because petitioner's books and records did not appear to include all of his income. Ms. Rael prepared a source and application of funds analysis for 1980 and 1981 from information from petitioners' returns, their bank records, and taxpayer interviews. Ms. Rael concluded that petitioners understated their income by $ 48,476.65 for 1980 and $ 130,094.44 for 1981. Petitioner hired Herman Gallegos, a certified public accountant, in 1983. Mr. Gallegos' assistant, Larry Flores, reviewed a set of petitioners' books and *755 records for 1980 and 1981 and tried to reconcile them to their tax returns for those years. Mr. Gallegos prepared a net worth analysis for 1980 and 1981, based on information petitioners gave him. Mr. Gallegos asked petitioner if he had any cash on hand at the beginning of 1980. Petitioner told him he had about $ 25,000 to $ 30,000 cash on hand at the beginning of 1980. Petitioner told Mr. Gallegos that he was concerned because he had told Ms. Rael that his cash on hand was $ 1,000. Mr. Gallegos used $ 30,000 as petitioner's cash on hand as of December 31, 1979, for his net worth analysis, and computed that petitioners had underreported their income for both years. Mr. Gallegos and Mr. Flores presented their net worth analysis to revenue agent Jose Salazar, who took over the case from Ms. Rael. 6. The Criminal Case
Petitioner was indicted on October 3, 1986, by a Federal grand jury for the Southern District of Texas, on two counts of violating section 7201 for taxable years 1980 and 1981. On the motion of the United States, the indictment was dismissed and another indictment was filed on February 6, 1987. This indictment also charged petitioner with violating section *756 7201 for taxable years 1980 and 1981. Petitioner moved to dismiss the indictment on the grounds of unnecessary delay in violation of 18 U.S.C. section 3161(c)(1) and the Sixth Amendment. The motion was granted on April 2, 1987, and the indictment was dismissed with prejudice. The matter was then reassigned to revenue agent Jose Salazar as a civil case. Mr. Salazar met with Michael de Los Santos, petitioners' accountant. Mr. de Los Santos showed Mr. Salazar a schedule of cash on hand as of December 31, 1979, which totaled $ 122,645. Petitioners gave the cash on hand information to Mr. de los Santos. The schedule shows possible savings by petitioner since 1944 from wages and other sources. It also states that petitioners took the following amounts from the alleged accumulated cash: Year
Item
Amount
1968
Downpayment on
residence (910 Susan)
$ 450   1969
Downpayment on
business truck
500
1971
Downpayment on residence
(5818 Shamrock)
1,000
1973
Downpayment on Rio
Encino property
450
1977
Purchase of lots
for residence
500
Construction costs of
residence
33,730
1979
Downpayment on residence
(Liptonshire)
16,500
Purchase of two $ 10,000 certificates
of deposit at Gulfway Bank
and American Bank
20,000
*757 Neither petitioner nor any of his representatives ever told Mr. Salazar that petitioner had a large amount of uncashed customer checks which he was holding on December 31, 1979. Petitioners' case was assigned to Appeals Officer Dale Osten in 1989. Mr. Osten met with Mr. de Los Santos, who gave Mr. Osten a copy of the schedule of cash on hand as of December 31, 1979. Neither petitioner nor any of his representatives ever told Mr. Osten that petitioner had a large amount of uncashed customer checks which he was holding on December 31, 1979. Mr. Osten prepared the notice of deficiency for 1980 and 1981, based on the net worth method, with $ 1,000 cash on hand as of December 31, 1979. In preparing for trial, petitioner gave his counsel an undated schedule that showed his total estimated cash accumulated as $ 139,000. OPINION Petitioners agree with all items in respondent's net worth computation except for cash on hand on December 31, 1979. Accordingly, we must decide whether we are convinced by petitioners' cash hoard claim. Petitioners also argue that respondent made a naked assessment and that respondent inadequately investigated leads. In addition, petitioners argue that, *758 if they are not liable for fraud, the statute of limitations expired before respondent issued the notice of deficiency. 1. Cash Hoard
a. Background
Respondent used the net worth method to determine petitioners' income for the years in issue. Under the net worth method, income is computed by determining a taxpayer's net worth at the beginning and end of a year. The difference between the two amounts is the increase in net worth. This difference is increased by adding nondeductible expenditures, including living expenses, and by subtracting gifts, inheritances, loans, and the like. Holland v. United States, 348 U.S. 121, 125 (1954); Cefalu v. Commissioner, 276 F.2d 122, 126 (5th Cir. 1960), affg. T.C. Memo. 1958-37. An increase in a taxpayer's net worth, plus his nondeductible expenditures, less nontaxable receipts, may be considered taxable income. Holland v. United States, supra.
In a net worth case, respondent must: (1) Establish, with reasonable certainty, an opening net worth, and (2) either (a) show a likely income source, or (b) negate *759 possible nontaxable income sources. Holland v. United States, supra at 132-138; Smith v. Commissioner, 91 T.C. 1049, 1059 (1988), affd. 926 F.2d 1470 (6th Cir. 1991); Brooks v. Commissioner, 82 T.C. 413, 431-432 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). b. Petitioners' Cash Hoard Claim
Petitioners contend that respondent failed to establish opening net worth with reasonable certainty. Petitioners assert that they had at least $ 170,000 cash on hand on December 31, 1979, consisting of as much as $ 130,000 in currency and $ 40,000 in uncashed checks. Petitioner testified that the cash hoard consisted of brand new $ 100 bills still in wrappers. They also testified that they had accumulated the cash since 1944. He further testified that the bills were in $ 2,000 wrappers which is the way he usually got cash from the bank. He testified that when he had enough to make a $ 100 bill, they went to the bank and exchanged it for a $ 100 bill, but not all were new. Respondent's determination of petitioners' *760 opening net worth as of December 31, 1979, and December 31, 1980, assumed cash of $ 1,000, as represented by petitioner to Ms. Rael. Petitioners testified that they understood Ms. Rael to ask them how much cash they had with them at the time of the interview. There is considerable evidence contrary to petitioners' claim. First, even if they did not understand "cash" to include checks, the $ 1,000 amount they indicated has no resemblance to the $ 130,000 in currency that they now claim. Second, they have made progressively larger cash hoard claims over the life of this case. Third, there is no evidence that they informed their accountants about the checks or cash in the amounts they now claim until shortly before the trial. This is contrary to petitioners' description of cash in their business which included currency and uncashed checks. We have found that the currency and uncashed checks that petitioner kept on hand for operational business purposes did not materially decline from December 21, 1979, through January 1, 1982. Petitioner conducted his business in a manner that appears inconsistent with a cash hoard. He picked up payments from general contractors, apparently *761 because he was cash poor. He testified that he sometimes needed the money to make his payroll. Petitioners argue that their misunderstandings about cash on hand result in part from Ms. Rael's inexperience. We disagree. Mr. Ochoa was present at the initial interview. He was Ms. Rael's on-the-job instructor. One of his duties was to observe her in the interview. Mr. Ochoa testified that Ms. Rael asked petitioner if his cash on hand at the beginning of 1981 was more than $ 3,000 and petitioner said no, and that she asked petitioner if it could have been more than $ 1,000 and he again said no. Ms. Rael's and Mr. Ochoa's testimony was credible and consistent. On the other hand, as we discuss below, petitioners' testimony was evasive, improbable, and inconsistent. c. The Colorado Trip in May 1979
Petitioners argue that circumstances surrounding their trip to Colorado in May 1979 to visit their daughter give credibility to their claim that they had a cash hoard of at least $ 170,000 as of December 31, 1979. Petitioners allege that Mrs. Daniels took about $ 40,000 in cash and placed it in a safety deposit box at Gulfway National Bank before the trip. Mrs. Daniels testified *762 that petitioners had purchased traveler's checks for the trip but forgot them, so they took cash instead. She testified that she took $ 70,000 in cash, and wrapped it in a handkerchief and pinned it to her brassiere. Petitioners' daughter, Janelle, testified she saw a large amount of cash pinned to her mother's brassiere during the Colorado visit. She was not specific about the dimensions of the cash. She testified on direct examination as follows: Q Do you recall how this stack might have been, or anything like that? You didn't get over close to it and inspect it, I guess, is what you are saying? A No. I mean, she didn't look deformed or anything, because we never even noticed it, you know, when she was wearing her normal clothes. She didn't look you know -- Q But it wasn't -- was it just in one stack, or was it spread out across her chest? A No, no, no. It was kind of like that; kind of overlapped in two stacks. Petitioner testified that his wife placed $ 70,000 in $ 100 bills in her brassiere during their trip to Colorado. Petitioner testified that they took the money with them because they did not want to leave that much cash at home. He testified that there were *763 700 new $ 100 bills in wrappers. Petitioners have not convinced us how much cash they took to Colorado, or that it was from petitioners' alleged cash hoard as compared to regular operating funds for business. Petitioners had different versions of how much money was in their floor safe at home before and after the trip. Petitioner testified that he personally counted $ 70,000 in currency in May 1979. He later testified that he counted $ 90,000 in currency in May 1979, and still later, he testified that he had no idea how much currency was in the safe in 1979. Petitioner's testimony about the money before and after the trip was vague, improbable, and inconsistent. We are not convinced that petitioners' story about their trip to Colorado lends support to their cash hoard claim. d. Mr. Nebrat's Observation of Petitioner's Cash
Petitioners argue that Mr. Nebrat, their attorney at the time, saw a large amount of cash in a bank bag at petitioner's place of business. He did not count the money, or have personal knowledge of the amount of cash. Mr. Nebrat could not specifically describe the money in the bag. He testified that he vaguely recollected seeing what could have been *764 $ 65,000 in cash, but he could not remember if he remembered the $ 65,000 figure from when he saw the money or from conversations just before the trial. Mr. Nebrat testified that he thought the cash was for business operations, such as to pay a contractor. Mr. Nebrat's testimony tends to show that petitioner maintained cash in his business, but it does not convince us that petitioners had the cash hoard they claim on December 31, 1979. e. Loans by Petitioners
Petitioners borrowed money on several occasions during 1979 and 1980. For example, they purchased trucks on credit at interest rates ranging from 13 to 18 percent. Evidence of borrowing supports an inference that they had no cash hoard because a cash hoard negates the necessity to borrow. Thomas v. Commissioner, 223 F.2d 83, 88 (6th Cir. 1955), revg. and remanding a Memorandum Opinion of this Court dated Oct. 30, 1953; see Holland v. United States, 348 U.S. at 133 (taxpayers would not have lost possession of their cafe and furniture and accumulated unpaid debts if they had a cash hoard of $ 104,000). Similarly, petitioners' agreement to pay judgment creditors *765 weekly, such as delinquent school taxes, is evidence that it was more probable than not that petitioners did not have a tax hoard. Petitioners did not include their claimed cash hoard on their financial statements to banks. Petitioners submitted loan documents to banks which did not list cash as an asset. The financial statement which petitioner signed on September 16, 1980, did not list the cash hoard. These omissions are evidence that they had no cash hoard. See Anderson v. Commissioner, 250 F.2d 242, 247 (5th Cir. 1957), affg. T.C. Memo. 1956-178 (cash hoard defense rejected where claimed cash hoard not included on financial statements taxpayer gave to banks to establish credit). f. Petitioners' Increased Cash Hoard Claims
Petitioners have increased the amount of their claimed cash hoard throughout the life of this case. They initially said that they had $ 350 in cash. They later said they had $ 1,000 cash on hand on December 31, 1979. They told Mr. Gallegos on February 24, 1983, that they had $ 23,000 to $ 30,000 as of December 31, 1979. Petitioner also told Mr. de Los Santos that he had $ 122,645 in cash *766 as of December 31, 1979. On brief, petitioners allege they had more than $ 170,000 in cash, currency and checks, as of December 31, 1979. Petitioners claim that their cash hoard included a large amount of uncashed checks. However, petitioners did not tell anyone, including Ms. Rael, Mr. de los Santos, or the appeals officer, of their alleged hoard of uncashed checks until after the petition was filed. In fact, petitioners did not claim they had uncashed checks until after they filed the petition in this case. Petitioner's testimony was evasive, vague, contradictory, and generally not credible. He had selective recall. He gave different amounts of currency and uncashed checks that he had on hand. His testimony contradicted documents that he prepared or that were prepared for him. For example, petitioner provided information to Mr. de los Santos who prepared a report for petitioners' cash on hand on December 31, 1979. Mr. de los Santos concluded that petitioners' cash on hand on December 31, 1979, was $ 122,645. Yet at trial, petitioner testified that the document was not correct. Similarly, petitioner provided the information for petitioners' Exhibit 15, a summary of sources *767 of estimated wages and savings for 1944 to 1969. It shows that the estimated cash accumulated was $ 139,000. Petitioner testified that it was correct. However, when questioned about the supporting details, petitioner agreed that the document was incorrect. Petitioner also testified that his financial statements and loan applications were not accurate. Another example is where one document asked if there were any unsatisfied judgments against petitioner. It was checked no. Petitioner admitted that it was incorrect as of February 21, 1980, the date he signed it. Petitioner stated that information that he gave his representatives for his criminal defense which showed less cash was not as correct as the information he used for his later civil case. He changed his testimony as he saw fit. For example, he testified that he never took money out of petitioners' cash accumulations. The next day he testified that he did. When asked "But you can remember you had cash on hand as of December 31, 1979?" petitioner answered, "Well, I looked at that twice a week, lady. I knew what I had in that vault." Later, he testified as follows: Q You testified previously you knew, but now you *768 don't have any idea? A I didn't say I knew for sure how much money I had in '79. There is no way of knowing. I didn't count it in December of '79. Q Wait a minute. You have already testified that you counted it twice a month. Did you count it -- A Some months we would. Q And some months you didn't? A That is right. Q So now you don't remember the last time that you counted this money? A No. We are not required to accept implausible, uncorroborated, and incoherent contentions as to the existence of a cash hoard. Anderson v. Commissioner, supra at 247; see Lovell & Hart, Inc. v. Commissioner, 456 F.2d 145, 148 (6th Cir. 1972), affg. T.C. Memo. 1970-335; Geiger v. Commissioner, 440 F.2d 688, 689 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Urban Redevelopment Corp. v. Commissioner, 294 F.2d 328, 332 (4th Cir. 1961), affg. 34 T.C. 845 (1960). Finally, petitioners argue that it does not matter whether the cash seen by various witnesses came from the cash hoard *769 or instead was related to the business. We disagree. Petitioner had cash and uncashed checks for his business operations. There is no credible evidence of any material decrease in the amount of cash and uncashed checks he kept on hand for his business from December 31, 1979, through January 1, 1982. Thus, the business cash is a constant which does not affect respondent's net worth analysis. In light of the foregoing, we reject petitioners' claim that they had a $ 170,000 cash hoard on December 31, 1979. 2. Petitioners' Argument That the Notice of Deficiency Was Arbitrary
Petitioners attack respondent's determination as arbitrary by asserting that it was a naked assessment. A naked assessment is one without substantive evidence linking the taxpayer to the income generating activity in question. United States v. Janis, 428 U.S. 433, 441-4422 (1976); Zuhone v. Commissioner, 883 F.2d 1317, 1325 (7th Cir. 1989), affg. T.C. Memo. 1988-142. Where a naked assessment occurs, the presumption of correctness does not apply to the Government's determination. United States v. Janis, supra; *770 Portillo v. Commissioner, 932 F.2d 1128, 1133 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990-68. To show there was no naked assessment, respondent must link petitioner to the income-generating activity. Respondent has shown that petitioner's plumbing business was a likely source of income. Petitioner used cash extensively. Petitioner kept his books and records in a manner that he could easily avoid reporting all income. He deposited less than half of his receipts in bank accounts. Respondent has clearly linked petitioner to the activities upon which the determination was based. Petitioner relies on Portillo v. Commissioner, supra, and Pearce v. Commissioner, 946 F.2d. 1543 (5th Cir. 1991), revg. 95 T.C. 250 (1990). In Portillo v. Commissioner, supra at 1133, the Commissioner determined that the taxpayer had unreported income by merely matching a Form 1099 with the taxpayer's Form 1040, without attempting to establish the reliability of the Form 1099. The court found that *771 the Commissioner considered information directly relating to the taxpayer's return. However, the court found that the determination was arbitrary, and required the Commissioner to show some indicia that the taxpayer received unreported income, such as the taxpayer's net worth, bank deposits, cash expenditures, or source and applications of funds. Portillo v. Commissioner, supra at 1133-1134. Here, respondent did a net worth analysis similar to what the court in Portillo suggested. In Pearce v. Commissioner, supra, the Government erroneously determined that no return had been filed. The taxpayers argued that the notices were invalid under Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983). That situation is plainly distinguishable from the present case. Here, the notice directly pertains to petitioners, and was issued after an extensive audit. Petitioners' reliance on Portillo and Pearce is misplaced. We conclude that respondent's determination was not arbitrary. 3. Respondent Adequately Investigated Leads
*772 Petitioners assert that respondent failed to adequately investigate leads provided by petitioners relating to their cash accumulations as of December 31, 1979. Respondent must investigate all leads presented by the taxpayer which are reasonably susceptible of being checked. Holland v. United States, 348 U.S. 121, 135-136 (1954). Petitioners testified about their cash hoard, but they have no records or other documents corroborating their claim. They also testified, along with their daughter, Janelle, about their trip to Colorado in May 1979 and that their cash was observed by their two daughters, Janelle and Deborah, and Mr. Nebrat. We conclude that these leads are not reasonably susceptible of being checked any more than they were done by respondent here. Petitioners did not offer any information which respondent failed to investigate. A taxpayer cannot complain about the sufficiency of an investigation where he has offered no leads. United States v. Penosi, 452 F.2d 217, 220 (5th Cir. 1971); Blackwell v. United States, 244 F.2d 423, 429 (8th Cir. 1957). Petitioners argue that respondent *773 failed to pursue petitioners' uncashed check claim. However, petitioners did not raise the issue of uncashed checks as a part of their cash hoard until after they filed their petition. That claimed lead is not reasonably susceptible of being checked. See Tunnell v. Commissioner, 74 T.C. 44, 57-58 (1980), affd. 663 F.2d 527 (5th Cir. 1981) (vague leads as to cash on hand offered long after audit commenced with poor evidence not reasonable). Accordingly, we conclude that respondent adequately investigated leads. 4. Additions to Tax for Fraud Under Section 6653(b)
Respondent determined that petitioner Glenn Daniels is liable for the fraud additions to tax under section 6653(b). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The existence of fraud is a question of fact to be decided by consideration of the entire record. Parks v. Commissioner, 94 T.C. 654, 660 (1990); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). *774 First, respondent must prove the existence of an underpayment. Parks v. Commissioner, supra. Respondent may not rely merely upon the taxpayer's failure to carry the burden of proof as to the underlying deficiency. Parks v. Commissioner, supra at 660-661; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). Second, respondent must show that the taxpayer intended to evade taxes by conduct intended to conceal, mislead, or similarly prevent tax collection. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111 (1983). a. Underpayment
Respondent may prove an underpayment by proving a likely source of the unreported income, Holland v. United States, supra; Parks v. Commissioner, supra; Nicholas v. Commissioner, 70 T.C. 1057 (1978); *775 or where the taxpayer alleges a nontaxable source, by disproving the specific nontaxable source so alleged. United States v. Massei, 355 U.S. 595 (1958); Kramer v. Commissioner, 389 F.2d 236, 239 (7th Cir. 1968), affg. T.C. Memo. 1966-234; Parks v. Commissioner, supra.
We believe that petitioner's plumbing business was a likely source of unreported income. Petitioner dealt extensively in cash. Petitioner kept his books and records in a manner that he could easily avoid reporting all income. Petitioner did not record in his books and records many payments from general contractors. He deposited less than half of his receipts in bank accounts. Petitioners failed to fully report their income on their income tax returns. Even the certified public accountant that petitioners hired in 1983 concluded that, even assuming petitioners' increased cash claim of $ 30,000 was true, petitioners had unreported income in both years in issue. We conclude that respondent has proven an underpayment for purposes of section 6653(b) for 1980 and 1981 by clear and convincing *776 evidence. b. Fraudulent Intent
Respondent must also prove by clear and convincing evidence that petitioners had the requisite fraudulent intent. Parks v. Commissioner, supra at 664. For purposes of section 6653(b), fraud means "actual, intentional wrongdoing," Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); or the intentional commission of an act or acts for the specific purpose of evading a tax believed to be owing. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. The courts have developed a number of objective indicators, or "badges" of fraud. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Examples of the badges of fraud present in this case are: (1) Large understatements of income, (2) inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets, and (5) dealings in cash. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), *777 affg. T.C. Memo. 1984-601. Petitioners did not satisfactorily explain their large understatements. But for the opening cash, petitioners agree to the net worth analysis. We have rejected their cash hoard claim. We do not believe petitioners' explanation that the only source of the cash hoard was savings from 1944 through December 31, 1979. It is more likely that the increased net worth resulted from petitioner's skimming from his plumbing business. Large unexplained discrepancies between petitioners' actual net income and the net income reported on their tax returns are evidence of fraud. Stone v. Commissioner, 56 T.C. 213, 214 (1971). Petitioners had inadequate records. They did not maintain any records of their alleged cash hoard. A taxpayer's failure to maintain accurate and complete records supports a finding of fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Reaves v. Commissioner, 295 F.2d 336, 338 (5th Cir. 1961), affg. 31 T.C. 690 (1958). Petitioner, *778 assisted by members of his family, kept his own books and records. According to petitioner, when he picked checks up from contractors, he recorded them in a book he carried for this purpose. Petitioner alleged that he or a member of his family recorded the amounts from the book in the cash receipts and cash payments journal. Petitioner testified that if income were not posted to the cash receipts journal, he could find it using the invoices from the billing system. This system lent itself to abuse because petitioner could simply chose not to record all gross income, which is what happened here. Many payments from general contractors were not recorded. A taxpayer's failure to supply complete information about income and expenses to his or her tax return preparer is another badge of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63. Petitioner decided what information to give to Mr. Patrick. He gave him no supporting documents, and he told Mr. Patrick that no further information was needed. This is another badge of fraud. Petitioners' testimony was implausible, *779 evasive, contradictory, and showed selective recall. Their story about the cash hoard is not believable and is uncorroborated by any documents. In addition to petitioners' testimony, three other witnesses, their two daughters and their attorney, testified that they saw large amounts of cash. Janelle Delaney and Mr. Nebrat testified that they saw cash in 1979. Deborah Wood testified that she saw cash over the years and in 1982 when she worked full time at the plumbing business. They did not know how much cash they saw or its purpose. They did not have independent knowledge that the cash they saw was a part of petitioners' purported cash hoard. Petitioners increased their claimed cash hoard from $ 350 to $ 1,000 shortly after the initial audit interview to at least $ 170,000 at trial. Between those times, petitioner told their accountant hired in 1983 that petitioners had a cash hoard of between $ 23,000 and $ 30,000. Petitioner previously told Ms. Rael that petitioners had $ 1,000 in cash. Petitioner's representative in his criminal case showed respondent's agent a schedule based on information provided by petitioner listing $ 122,645 cash on hand. Petitioners' claim as *780 to cash on hand were inconsistent. Fraud may be inferred where the taxpayer makes false and inconsistent statements to revenue agents, Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980), or files false documents, Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Petitioner gave Ms. Rael two different sets of books and records. He gave her the second set with large adjustments to sales after she told him of the problems with reconciling his first set to his return. His explanation that he copied the information because the first set of books was too messy is not credible. Petitioner testified that documents that he had prepared or that were prepared on his behalf were incorrect if it suited him to so state. We believe he was attempting to mislead the Court. Petitioner told Ms. Rael that he deposited all of his receipts into one of two bank accounts. In fact, petitioner deposited about one-half of those receipts. Petitioners did not mention their cash hoard on their loan applications or financial statements. Petitioners did not tell their criminal *781 representative of the uncashed checks they now include in their cash hoard claim. They did not tell the appeals officer assigned to their case about the uncashed checks. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, 317 U.S. 492, 499 (1943). A pattern of consistent underreporting of income for a number of years, especially when accompanied by other circumstances showing intent to conceal is strong evidence of fraud. Holland v. United States, 348 U.S. 121, 137-139 (1954); Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37; Foster v. Commissioner, 391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue T.C. Memo. 1965-246; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). Petitioner testified that he had no problem hiding assets from his creditors. We think petitioner had no problem misleading *782 the Government as well. Finally, petitioner had extensive unexplained dealings in currency which can indicate fraud. Bradford v. Commissioner, 796 F.2d 303, 308 (9th Cir. 1986), affg. T.C Memo. 1984-601. Petitioner's dealings in cash gave him ample opportunity to skim unreported income from his plumbing business. We believe he took full advantage of that opportunity. We conclude that respondent has proven fraud by clear and convincing evidence. Accordingly, we hold that Mr. Daniels is liable for the additions to tax for fraud under section 6653(b). 5. Statute of Limitations
Petitioners allege that the statute of limitations precludes assessment and collection for 1980 and 1981. Petitioners concede that the statute of limitations for both 1980 and 1981 is open if the Court finds petitioner liable for fraud. Sec. 6501(c)(1). As discussed above, we have so found. Consequently, we hold that the statute of limitations does not preclude assessment and collection for 1980 and 1981. To reflect concessions and the foregoing, Decision will be entered under Rule 155.